GALVESTON, HARRISBURG & SAN ANTONIO RAILWAY V.
MRS. ANNIE L. WELLS ET AL.

No. 5425. Decided April 21, 1932.
(50 S. W., 2d Series, 247.)

312

Proctor, Venderberger, Crain & Mitchell, of Victoria, Baker, Botts, Parker & Garwood, of Houston, Peareson & Peareson, of Richmond, for plaintiff in error.

The mere fact that Congress, or the Interstate Commerce Commission, may not have specifically regulated each particular phase of interstate commerce, will not authorize a state to attempt its regulation, or in such a manner as to impose an undue burden on such commerce, for the reason that the Congress is the paramount authority in reference to such commerce, and its occupancy of its general·field excludes any regulation, or imposition of undue burden thereon by the States, and any

such attempt by the States would have the effect of a conflict with such paramount authority. Sanitary District of Chicago v. United States, 266 U. S., 405, 69 L. Ed., 352; Napier v. A. C. L. R. Co., 272 U. S., 605, 71 L. Ed., 439; Bacon v. Illinois, 227 U. S., 504, 57 L. Ed., 615; St. Louis S. F. Ry. v. Pub. Ser. Com., 261 U. S., 369, 67 L. Ed., 701.

No evidence was introduced by appellees that the bell of the locomotive was not rung at a distance of at least 80 rods from the place where the railroad crossed the public road and that it was not kept ringing until it crossed said point, the testimony introduced by appellees being limited to that of a number of witnesses to the effect that they did not hear the bell, and the testimony of such witnesses not only did not show that they were so situated as that they would probably have heard the bell had same been so rung, but, on the contrary, as to each witness the evidence showed that such witness was so situated, or so engaged, as that they would probably not have heard the bell. Such evidence was insufficient to raise the issue that the bell of the locomotive was not rung for the statutory distance from, and in the statutory manner as the train approached, the crossing; and this is especially true in view of the positive testimony of other witnesses that the bell was so rung. I. & G. N. Ry. Co. v. Arias, 30 S. W., 446; Hines v. Roan, 230 S. W., 1080.

No duty arises on the part of a railway company to maintain a watchman, or electric bell signal, or wigwag signal at a grade crossing across its railway track to warn a traveler about to use such crossing of the approach thereto of a railway train or car, unless the crossing at the very time of such contemplated use by such traveler is extra-dangerous or extra-hazardous.

And likewise the evidence being insufficient to raise any issue that the crossing was extra-dangerous or extra-hazardous at the time of the collision between the automobile and the train, same was insufficient to raise any issue of negligence based on the fact that there was no wigwag signal installed and in operation at the crossing as the deceased Ray M. Wells approached the crossing and entered thereon to warn persons about to use same, of the approach of trains. Louisiana Ry. & Nav. Co. v. Loudermilk, 295 S. W., 195, on rehearing, 196; Galveston H. & S. A. Ry. v. Burr, 291 S. W., 299; Hines v. Hodges, 238 S. W., 350; Chicago, etc. Ry. v. Zumwalt, 239 S. W., 912.

There being no allegation of negligence based on any viola-

tion by appellant of any statute or ordinance regulating the speed of the train, appellant was entitled to have the jury instructed that it was not negligence per se, nor a violation of the law to run the train at any particular speed.

Even if it be true as found by the jury that the train was running at the rate of fifty miles per hour, nevertheless such rate of speed in so far as it was responsible for the arrival of the train at the time at which the automobile was driven thereon, is not in legal contemplation the proximate cause of the collision between it and the automobile in such circumstances. McDonald v. I. & G. N. Ry., 86 Texas, 1.

*C. I. McFarlane, W. J. Knight, Morris, Sewell & Morris,* all of Houston, for defendant in error.

We contend that the Transportation Act does not invade the rules of law prevailing in the several states and in this State, and that no such intention can be wrung from the Act by a careful reading of it. Sherlock v. Alling, 93 U. S., 99, 23 L. Ed., 819; Southern Railway Company v. King, 217 U. S., 524, 54 L. Ed., 868; Smith v. Alabama, 124 U. S., 465, 31 L. Ed., 508.

Our contention is that the evidence was amply sufficient to go to the jury, and to sustain its findings of fact that such bell was not rung. Galveston, H. & S. A. Ry. Co. v. Tirres, 76 S. W., 806—error refused; Chicago & R. I. Ry. Co. v. Johnson, 224 S. W., 277; G. H. & H. Ry. Co. v. Copley, 176 S. W., 665.

Our contention is that this crossing was peculiarly and dangerously hazardous, and required these precautions, which we contend was amply supported by the testimony. Tisdale et al. v. Panhandle & S. F. Ry., 228 S. W., 133; Chicago, R. I. & P. Ry. Co. v. Zumwalt, 239 S. W., 912; Galveston, H. & S. A. Ry. Co. v. Burr, 291 S. W., 299 (error refused).

Appellant contends that there was no evidence, or not sufficient evidence to warrant the jury in finding that the engine whistle was not blown after the engine had passed the regular whistling post and before the engine had reached the crossing.

Our contention is that the evidence abundantly establishes this fact and the jury was warranted in so finding. Missouri, K. & T. Ry. Co. of Texas v. Oslin (Civ. App.), 63 S. W., 1039 (writ of error denied).

Under the evidence in this case the trial judge properly submitted to the jury the issue as to the speed of the train and the issue as to whether or not such speed was negligence,

and there was no error in the submission of such issue. Lancaster v. Browder, 256 S. W., 905; Baker v. Harmon et al., 254 S. W., 517; Smith v. Galveston Houston Electric Co., 277 S. W., 104; Missouri, K. & T. Ry. Co. of Texas v. Luten, 203 S. W., 909.

Appellant's propositions, if sustained, would have the effect of withdrawing from the jury's consideration the question of the negligence of the deceased, whereas it is the settled law of Texas that in crossing cases such issue is not one of law, but is a question of fact for the determination of the jury. Rowe v. Treude, 298 S. W., 617, and cases cited therein.

The jury upon ample evidence having found that the defendant was negligent upon other grounds, which negligence was a proximate cause of the death of the deceased, which other findings are amply sufficient to sustain the judgment of the court, the error complained of in appellant's foregoing propositions last mentioned, is harmless. Texas & Pac. Ry. Co. v. Hilgartner, 149 S. W., 1091; Barron v. Houston, East & West Texas Ry. Co., 249 S. W., 825.

MR. JUSTICE PIERSON delivered the opinion of the court.

Mrs. Annie L. Wells, for her own benefit and as next friend of and for the benefit of her minor son, Ray M. Wells, Jr., instituted this suit in the district court of Fort Bend county against the Galveston, Harrisburg & San Antonio Railway Company for recovery of damages in the sum of $100,000 by reason of the death of her husband, Ray M. Wells; in a collision at a public road crossing in Fort Bend county on October 25, 1926, between a train and an automobile driven by the deceased Wells. It was alleged that the deceased Wells was an employee of the Gulf Production Company, a subscriber holding a policy of compensation insurance issued by the Gulf Casualty Company.

The deceased's father and mother were made parties to the suit, but they disclaimed any recovery to which they might be entitled. The Gulf Casualty Company was also made a party because of its right of subrogation to the extent of the amount of insurance assumed by it and awarded by the Industrial Accident Board.

The railway company answered by general demurrer, special exceptions, general denial, plea of contributory negligence on the part of the deceased, and that the train which collided with the deceased's automobile was engaged in and was an instrumentality of interstate commerce, of which the Congress of the

United States had assumed control through the Interstate Commerce Act, the Transportation Act of 1920, the Federal Employers Liability Act, the Federal Safety Appliance Act, and through the Interstate Commerce Commission Act and amendments thereto. That by reason of the Federal laws, any judgment recovered would be a burden on interstate commerce, and further, that by reason of the Federal laws and the decisions of the Supreme Court of the United States the alleged negligence of Wells constituted a complete bar to any right of recovery by his widow and child.

The testimony shows that the train in question which struck Wells was an interstate train operated between New Orleans and San Francisco. It was scheduled to leave Houston on the day in question at 10:30 a. m., and left that point five minutes late. It reached Missouri City about three minutes late. Missouri City, where Wells was struck, is situated about fifteen miles west of Houston, and is not a scheduled stop for that train.

The railroad at Missouri City runs practically east and west, and in approaching Missouri City going west it is perfectly straight for a number of miles. Paralleling the railroad going into and through Missouri City is the Old Spanish Trail, a paved highway passing between the railroad and the business section of Missouri City. Just west of the station and close to it a public highway crosses both the highway and the railroad practically at right angles. At the time of the accident, and for some time prior thereto, the Old Spanish Trail was closed for repairs between Missouri City and Houston, and traffic was detoured from this road over the dirt crossing in question. This crossing was used by school children going to and from school every day. According to the evidence, this highway at the time deceased was killed was used constantly by the public generally. It was shown that quite a number of people lived north of the railroad tracks at this point, and that in sending their children to school and in going to any point south of the railroad in the vicinity of the town the dirt road crossing the railroad was used a great deal. The testimony shows that a great amount of freight was handled at Missouri City for the use and benefit of the town and other points out of Missouri City on the south side of the railroad, including not only the town of Missouri City, but Blue Ridge, an oil field, in which operations had been conducted for a long while, and were then being conducted by the Gulf Production Company and other large companies, and that such companies had quite a lot of

freight, express, and other matters out of Missouri City, and that all traffic from the oil field, as well as other territories south of the city, had to go to the railroad station at Missouri City and return therefrom by crossing the dirt road highway just west of the railroad station.

It was further shown that the railroad company had arranged about the station house, and especially on the west and north sides thereof, parking space for the use of its customers and for trucks and wagons and persons having business with the company, and that at and about the depot building obstructions were present, and that these obstructions and the depot house cut off the view of trains approaching from the east going west, and that such trains could not be seen by persons west of the station until they had passed the station house and were close on the crossing. That a great number of passenger and freight trains passed through Missouri City each day going each way, and that many of the trains did not stop there on the regular schedule.

Some witnesses who were close by at the time of the collision testified that they were in a position to have heard the bell ringing, and yet they did not hear the bell ringing. Testimony was also introduced showing that after the whistle was blown at the whistling post, no more whistling for the crossing was done.

It was shown that Wells had some business to transact with the station agent. After transacting this business, he left the station a short time before the train arrived, and went to his automobile parked somewhere in the rear of the station a short distance from the crossing. No witness testified to having seen Wells or the automobile after he started his car and proceeded toward the crossing, except the witness Stevenson, the engineer, who did not testify as to the rate of speed the automobile was traveling. He testified in the following language: "I knew that people might be coming from the back end of the depot over that crossing. I have seen people about there before. * * * I knew that an automobile might be coming from around over there across this crossing." He also testified that when he saw the automobile it was about twenty feet north of the track approaching the crossing, and it appeared to him that Wells was looking right squarely at the train. A west-bound passenger train running something like fifty miles per hour, and behind schedule time, struck the rear end of Wells' automobile as he was leaving the station going south and attempting to cross the railroad tracks, and knocked the automobile and

deceased a great distance, killing deceased instantly. There was testimony to the effect that the train after hitting Wells ran 350 or 400 yards before it stopped.

Walton, the train conductor, said that the train which killed Wells had a schedule time of thirty-eight miles per hour, but that it was late that particular day. Some other witnesses testified that it was running something like fifty miles or more per hour at the time. Harris, the general road foreman of motive power, who was riding in the engine at the time of the collision, testified that he saw the top of the automobile go by from north to south just as it came in front of the locomotive. In describing it Harris used this language: "and just at that time the automobile slipped over the crossing just like that (indicating by a snap of the fingers)." He further testified in substance: I would judge the weight of that train to be 800 tons, and with a train weighing that amount moving fifty miles an hour, it takes its required time with the brakes to stop it. "Passing that station running 45 to 55 miles an hour and seeing a man coming on that track you couldn't stop that train in time to save him. If you saw the car in time, why, you could slow down some, or if you saw the car in time you could stop. * * * In railroad parlance, by having a train under control is meant to stop it in a reasonable distance. * * * The speed of that train was not reduced on approaching that road crossing before the collision. * * * As to whether or not it is a fact that the engineer did not have the train under control on passing that corner, I will say he was traveling at the speed—what we say is full speed. It wasn't under control, prepared to stop at any particular minute. Engine men frequently get train orders to approach a station carefully under control. No, that does not mean to approach it at 50 miles an hour."

The fireman testified that, "when I first saw the automobile it was coming from in front of the engine; the engine had just about struck it * * * and it was going away from the engine. * * * It looked to me like the automobile was going away from the engine at the time it was struck."

The evidence raised certain issues of fact to be determined. The cause was submitted to a jury, who found, in answer to special issues, that the train operatives, upon approaching the crossing, did not begin ringing the bell at least eighty rods from the crossing, and did not continue to ring same until the crossing was reached, and that such failure was a proximate cause of the collision and death of the deceased; that the operatives of the train did not have it under control on approaching

the crossing, which was negligence and a proximate cause of the collision and death of the deceased. The jury found also that a person of ordinary prudence, in the exercise of ordinary care, under the facts in this case, as to the physical conditions, location, and surroundings of the crossing in question, would have had installed and in operation a bell or a wig-wag or a watchman at said crossing, to warn persons about to use the same of the approach of trains, the failure to do which was negligence and a proximate cause of the collision and death of the deceased. The jury found that the train operatives upon approaching the crossing did sound the whistle at least eighty rods from it; that a person of ordinary prudence in the exercise of ordinary care in the ordinary operation of trains would blow the whistle after coming within eighty rods of the crossing for the purpose of warning persons about to use the crossing of the approach of said trains; that the operatives of the engine pulling the train in question after coming within eighty rods of said crossing did not sound the whistle in time to have warned persons about to use the crossing of the approach of said train, which was negligence and a proximate cause of the collision and death of the deceased. The jury found further that the train was being operated at a speed of fifty miles per hour; that under all the facts and circumstances in evidence it was negligence to operate said train at such rate of speed on that occasion, and such negligence was a proximate cause of the collision and death of the deceased.

The jury assessed the damages at $30,000, of which $20,000 was allotted to the widow and $10,000 to the minor child.

In answer to special issues requested by the defendant railway company, the jury found that the deceased did not find out that the train was approaching the crossing before he drove the automobile on it, and that a reasonably prudent person, situated as was the deceased on approaching such crossing in an automobile, in the exercise of ordinary care, under the same or similar circumstances, would not have found out that the train was approaching the crossing before he drove the automobile on it.

In answer to another special issue requested by the defendant railway company, the jury found that the deceased, in approaching the crossing, did exercise ordinary care such as a man of ordinary prudence, under the same or similar circumstances, would have used, to discover the approach of the train and to avoid contact with it.

Judgment was accordingly rendered for plaintiffs, the

widow and minor son of the deceased, against the railway company, out of which the Gulf Casualty Company was awarded $6,293, cash value of the award made by the Industrial Accident Board against the casualty company in favor of the plaintiffs.

Plaintiff in error contends that the train which collided with the deceased was engaged in interstate commerce governed and controlled exclusively by the Acts of Congress of the United States; that the deceased was guilty of negligence as a matter of law which caused his death, and plaintiff in error would not be liable therefor, and to permit a recovery of the judgment rendered herein would impose an undue and wrongful burden on interstate commerce.

■ The rule is now firmly established that where the railroad and employee are engaged in interstate commerce, the Federal Employers Liability Act and the amendments thereto and other Federal laws enacted by the Congress of the United States, applicable to railroad carriers, supersede the laws of the several States in so far as they cover the same field. 39 C. J., pp. 265 and 266; 12 C. J., pp. 74 and 77, and authorities cited; 5 R. C. L., sec. 12, pp. 699 and 700, sec. 26, p. 714.

■ It is also equally well established that if there has been no congressional regulation of the same subject, and provided no special burden is imposed on interstate commerce, the States may legislate for the safety and convenience of the public and the employees of the railroads by regulating railroads operating within their boundaries, although such regulations incidentally affect interstate commerce. 12 C. J., pp. 70 and 71, and authorities cited; 5 R. C. L., sec. 27, p. 715.

■ The Federal laws declare two distinct and independent liabilities based upon the common foundation of a wrongful injury: (1) Liability to the injured employee for which he alone can recover; and (2), in case of death, liability to his personal representative. While not creating a new cause of action, the Act modifies common law rules as to the defenses of contributory negligence, assumption of risk, and negligence of fellow servants. The Act being remedial, it is to be liberally construed, but it applies only when the relation of master and servant exists and where the plaintiff at the time of the injury was engaged in the work of the master. 39 C. J., pp. 265 and 266, and authorities cited; Missouri, K. & T. Ry. Co. v. Blalack, 105 Texas, 296.

■ The rule is unquestioned that until Congress has legislated upon a subject, the liability of such railroad for damages to property or person may be regulated and controlled by the law of the State, although the railroad is engaged in the business of interstate commerce. Such regulations would fall within the large class of regulations which it is competent for a State to make in the absence of legislation by Congress, growing out of the territorial jurisdiction of the state over such railroads and its duty and power to safeguard the general public against acts of misfeasance and nonfeasance committed within its limits, and to secure needed local protection in the operation of railroad trains, even though such trains are used in interstate commerce. Atlantic Coast Line R. R. Co. v. Georgia, 234 U. S., 280, 58 L. Ed., 1312; Adams Express Co. v. Croninger, 226 U. S., 491; Smith v. Alabama, 124 U. S., 465, 31 L. Ed., 508; 8 Sup. Ct. Rep., 564; New York, N. H. & H. R. Co. v. New York, 165 U. S., 628, 41 L. Ed., 853, 17 Sup. Ct. Rep., 418; Chicago, M. & St. P. R. Co. v. Solan, 169 U. S., 133, 137, 42 L. Ed., 688, 692, 18 Sup. Ct. Rep., 289; Richmond & A. R. Co. v. R. A. Patterson Tobacco Co., 169 U. S., 311, 42 L. Ed., 759, 18 Sup. Ct. Rep., 335; Cleveland C. C. & St. L. R. Co. v. Illinois, 177 U. S., 514, 44 L. Ed., 868, 20 Sup. Ct. Rep., 722; Pennsylvania R. Co. v. Hughes, 191 U. S., 477, 48 L. Ed., 268, 24 Sup. Ct. Rep., 132; Postal Telegraph-Cable Co. v. Warren-Godwin Lumber Co., 251 U. S., 27.

■ The Federal laws governing the regulation of common carriers do not undertake to regulate the tort liability of interstate carriers to third persons not in the employment of the company. Congress not having legislated upon this field by fixing the liability of a carrier, and no Federal question being involved, the law controlling the liability of a railroad to a person injured at a crossing, as the deceased was in this case, will rest upon the rules announced by the courts of the state in which the injury occurred. Enterprise Irrigation District v. Farmers Mutual Canal Co., 243 U. S., 157; Hammond v. Johnston, 142 U. S., 73, 78, 35 L. Ed., 941, 942, 12 Sup. Ct. Rep., 141; Eustis v. Bolles, 150 U. S., 361, 37 L. Ed., 1111, 14 Sup. Ct. Rep., 131; Berea College v. Kentucky, 211 U. S., 45, 53, 53 L. Ed., 81, 85, 29 Sup. Ct. Rep., 33; Waters-Pierce Oil Co. v. Texas, 212 U. S., 112, 116, 53 L. Ed., 431, 433, 29 Sup. Ct. Rep., 227; Caar, S. & Co. v. Shannon, 223 U. S., 468, 56 L. Ed., 510, 32 Sup. Ct., 236; Southern P. Co. v. Schuyler, 227 U. S., 601, 610, 57 L. Ed., 662, 43 L. R. A. (N. S.), 901, 33 Sup. Ct. Rep., 277; 39 C. J., pp. 266 and 267; Georgia Ry. & B. Co. v. Stanley, 38 Ga. App., 773,

145 S. E., 530; Key v. Carolina & N. W. Ry Co., 150 S. C., 29, 147 S. E., 625.

■ We will now consider the foregoing rules in the light of this record. It is well settled in this State that a failure of a person approaching a railroad crossing to stop, look, and listen for approaching trains, and is killed or injured, does not constitute contributory negligence as a matter of law, but it is a question of fact to be determined under all the surrounding facts and circumstances. Trochta v. Missouri, K. & T. Ry. Co., 218 S. W. (Com. App.), 1038; Kirksey v. Southern Traction Co., 110 Texas, 190; Houston & T. C. Ry. Co. v. Wilson, 60 Texas, 142; Barron v. Houston, E. & W. T. Ry. Co., 249 S. W., 825 (Com. App.); Freeman v. Galveston, H. & S. A. Ry., 285 S. W., 608 (Com. App.); Galveston, H. & S. A. Ry. v. Leifeste, 8 S. W. (2d) 764, 22 S. W. (2d) 1061; Chicago, R. I. & G. Ry. v. Laro, 273 S. W., 684.

The testimony shows that the view of the crossing where Wells was killed was obstructed by the station building and other structures until a traveler going south reached within a short distance of the main track of the railroad; that much travel passed over this road, and many trains passed each way during the day; that the operatives of the trains could not see a person about to cross the track, as Wells was attempting to do, until he was near the track, and the person undertaking to cross the railroad track going south could not see a train coming from the east going west until within a short distance of the track.

■ In view of this condition of the crossing, the rule has been announced, and it is supported by sound reasoning, that although the statute (Article 6371, R. S., 1925) only provides for the sounding of the whistle and the ringing of the bell when a train is at least eighty rods from the crossing, when the evidence shows that the view of the crossing is partially obstructed and that much travel passed over the crossing each day, and was of such a character as to make it peculiarly and extraordinarily dangerous, it becomes a question for the jury to determine, under all the circumstances, whether or not failure to sound the whistle or ring the bell after the engine is nearer the crossing than eighty rods is negligence. Missouri, K. & T. Ry. Co. v. Oslin, 63 S. W. (Civ. App.), 1039 (writ of error denied).

■ Both the State and Federal decisions support the rule that railway companies should maintain a flagman in towns and

cities at crossings which are unusually dangerous or attended with more than ordinary hazard, although there is no city ordinance or statute requiring it. Evidence showing that special circumstances exist in a case which make the crossing unusually hazardous, is held sufficient to justify submission to a jury of the issue of the railroad's negligence at the time of the accident. Missouri, K. & T. Ry. Co. v. Magee, 92 Texas, 616, 50 S. W., 1013; Tisdale v. Panhandle & S. F. Ry. Co., 228 S. W., 133 (Com. App.); Central Texas & N. W. Ry. Co. v. Gibson, 83 S. W., 862 (Civ. App.), 99 Texas, 98, 87 S. W., 814; Grand Trunk Ry. Co. v. Ives, 144 U. S., 408, 12 Sup. Ct. Rep., 679, 36 L. Ed., 485; Illinois Central v. Coley, 121 Ky., 385, 89 S. W., 234; Annaker v. Chicago, etc. Ry. Co., 81 Iowa, 267, 47 N. W., 68; Southern Ry. Co. v. Winchester, 127 Ky., 144, 105 S. W., 167; Delaware & H. Ry. Co. v. Larnard, 161 Fed., 520, 88 C. C. A., 462; Illinois Central v. O'Neill, 177 Fed., 330, 100 C. C. A., 658.

■ Likewise, it is held that where a person has been injured or killed at a much traveled crossing, in close proximity to buildings or other obstructions, and at which there were obstructions to the view of the traveler or those operating the train, the question of whether the railroad was guilty of running its train at an excessive and dangerous rate of speed was an issue of fact for the jury to determine. Smith v. Galveston-Houston Electric Ry. Co., 277 S. W., 103 (Com. App.); Lancaster v. Browder, 256 S. W., 905 (Com. App.); Texas & P. Ry. Co. v. Tucker, 106 S. W., 764 (Civ. App.), (writ denied); Missouri, K. & T. Ry. Co. v. Luten, 203 S. W., 909 (Civ. App.); Baker v. Hodges, 231 S. W., 844.

■ Where the evidence shows that a crossing was much used by the public; that the view of the railroad track to the east to persons traveling south on the highway and approaching the crossing was obstructed by buildings until a point about 20 or 30 feet of the track is reached; that by reason of the surrounding conditions the crossing was more than usually dangerous and hazardous; that the railroad company ran its train at a high rate of speed over such crossing; that in view of all these conditions persons of ordinary care operating railroad trains under similar circumstances would have had a watchman or have maintained a wig-wag signal or some device to warn travelers of approaching trains,—raises a question for the jury. Smith v. Galveston-Houston Electric Ry. Co., supra; Tisdale v. Ry. Co., supra; St. L. S. W. Ry. Co. v. Lewis, 297

S. W., 896. Of course, the railroad company would not be required to maintain both a flagman and a wig-wag or some other device to warn travelers of approaching trains. · The rule would be complied with if either means was sufficient to warn travelers of the dangers incident to the use of the crossing.

■ But it is earnestly contended that the rule announced by the Supreme Court of the United States in the case of Baltimore & O. R. R. Co. v. Goodman, 275 U. S., 66, 72 L. Ed., 16, controls this case. Of course, where Congress, by its legislation within the power granted by the Constitution of the United States, has preempted and occupied the field of regulation of a matter, it is to the exclusion of State regulation. Congress has not preempted the question involved in this suit, and therefore the regulation of such matters provided for by the laws of this State will control.

The Goodman case originated in the Federal Court, and the Supreme Court of the United States applied the rule stated in that opinion to that case. This case originated in the State court, and involves no Federal question, and hence will not be controlled by the rule announced by the Federal courts, but will be controlled by the rule announced by the authoritative decisions of the courts of this State.

The case of Atlantic Coast Line Co. v. State of Georgia, 234 U. S., 280, 58 L. Ed., 1313, involved the validity of a statute passed by the Legislature of Georgia. It was contended there that the statute interfered with and placed a burden upon interstate commerce. It was contended by the State of Georgia that the act of the Legislature did not in any way conflict with any Act of Congress or any rule or regulation of the Interstate Commerce Commission, and in the absence of such conflict the Federal Courts will not declare the Act invalid as interfering with interstate commerce. As long as the field has not been completely covered by Congress, the states have the right under their reserved police power to legislate and control the subject. Associate Justice Hughes, in speaking for the Supreme Court of the United States, clearly and tersely states the rule as follows:

"In thus deciding, the court applied the settled principle that, in the absence of legislation by Congress, the states are not denied the exercise of their power to secure safety in the physical operation of railroad trains·within their territory, even though such trains are used in interstate commerce. That has been the law since the beginning of railroad transportation. It

was not intended that, pending Federal action, the use of such agencies, which, unless carefully guarded, was fraught with danger to the community, should go unregulated, and that the states should be without authority to secure needed local protection."

The case of Smith v. Alabama, supra, involved the power of the State of Alabama to enact regulations of employees operating trains engaged in Interstate Commerce, and in an exhaustive opinion sustaining that right, Justice Matthews, speaking for the Supreme Court of the United States, says:

"It is to be remembered that railroads are not natural highways of trade and commerce. They are artificial creations; they are constructed within the territorial limits of a State, and by the authority of its laws, and ordinarily by means of corporations exercising their franchises by limited grants from the State. The places where they may be located, and the plans according to which they must be constructed, are prescribed by the legislation of the State. Their operation requires the use of instruments and agencies attended with special risks and dangers, the proper management of which involves peculiar knowledge, training, skill, and care. The safety of the public in person and property demands the use of specific guards and precautions. The width of the gauge, the character of the grades, the mode of crossing streams by culverts and bridges, the kind of cuts and tunnels, the mode of crossing other highways, the placing of watchmen and signals at points of special danger, the rate of speed at stations and through villages, towns, and cities, are all matters naturally and peculiarly within the provisions of that law from the authority of which these modern highways of commerce derive their existence. The rules prescribed for their construction and for their management and operation, designed to protect persons and property, otherwise endangered by their use, are strictly within the limits of the local law. They are not per se regulations of commerce; it is only when they operate as such in the circumstances of their application, and conflict with the expressed or presumed will of Congress exerted on the same subject, that they can be required to give way to the Supreme authority of the Constitution."

The case of Nashville Ry. Co. v. White, 278 U. S., 458, 73 L. Ed., 276, involved the validity of an ordinance enacted by the city of Memphis in the State of Tennessee, requiring the railroads to maintain a watchman at a crossing. The case originated in the state court. It was found that the violation

of the ordinance in failing to have a watchman was the proximate cause of the accident. It was contended that the ordinance imposed a burden upon interstate commerce. The liability of the railroad company was affirmed. The case reached the Supreme Court of the United States, and was affirmed by that court in an opinion written by the same eminent judge who wrote the opinion in the Goodman case, supra.

In this case the testimony shows that Wells was in the depot transacting some business with the agent of the railroad just a few minutes before his death. No one testified as to his movements after leaving the office of the agent until seen by the engineer, fireman, and the road foreman just about the time of the collision. No witness testified that Wells did not look for approaching trains before getting into his automobile. It is admitted that it is something like five miles from West Junction to Missouri City; that it is on open prairie country; that the track is straight, and an approaching train could be seen by a person on or near the track for three or four miles before it reached the crossing. If a person situated as Wells was situated when he came out of the agent's office looked down the track and saw no train within three or four miles, he could reasonably conclude that a train running on a schedule of thirty-eight miles per hour would require something like five minutes to travel that distance; that he would have plenty of time to get into his automobile and cross the railroad track before the arrival of the train. It is undisputed that his automobile was practically across the track when struck by the train, and the testimony supports the view that if the train had been operated within the schedule adopted by the railway company, or with regard for the exercise of that degree of care that was due persons using this public crossing, Wells would have had ample time to have passed over the crossing in safety.

 Many issues were submitted to the jury. The jury found in answer to special issues that the operatives of the engine did not blow the whistle or ring the bell within a distance of eighty rods of the crossing. Many other findings of negligence on the part of the railroad were made by the jury. They also found that the deceased was not guilty of negligence. This issue was properly submitted to the jury. It was shown that the station building extended within a few feet of the track; that deceased's car was stationed at the rear or at the west end of the station building; that shrubbery, fences, and trucks may have further obstructed deceased's view until he was almost on the track, and that the train approached and

passed the crossing at a very fast rate of speed. An affirmative answer to any of the issues submitted, wherein it was found that the company was guilty of negligence and that such negligence was the proximate cause of the death of deceased, would support the judgment rendered in this case. If it be conceded that certain issues were improperly submitted, in view of this record they become immaterial and harmless. We find no reversible error.

The judgments of the district court and of the Court of Civil Appeals will be affirmed.