Louis Berry **HARDGRAVE** et al., Appellants,

v.

**TEXAS & PACIFIC RAILWAY COMPANY** et al., Appellees.

No. 16665.

Court of Civil Appeals of Texas.

Dallas.

March 18, 1966.

Rehearing Denied April 22, 1966.

Geary, Brice & Lewis, W. S. Barron, Jr., Thompson, Knight, Wright & Simmons, Frank Finn, Jr., Dallas, for appellants.

Jackson, Walker, Winstead, Cantwell & Miller, L. P. Bickel and Gerald W. Benson, Dallas, for appellees.

CLAUDE WILLIAMS, Justice.

Appeal from a "take nothing" judgment in a personal injury action. On November 18, 1958 at approximately 11:15 p. m. Louis B. Hardgrave and Clarence T. McCleery, both employed by Valley Steel Products Company, were occupants of a White diesel truck proceeding in a northerly direction on South Lamar Street in the City of Dallas, Texas. The night was clear and the streets were dry. Hardgrave was driving the truck and McCleery was the passenger. A railroad track, commonly called the Dallas Belt Line, crossed South Lamar Street. At the point in question the railway track is in the form of a U-shaped curve. Leaving the Union Terminal Building the tracks proceed in a southeasterly direction, cross South Lamar Street and then swing in a northwesterly direction. The track is owned and maintained by the Southern Pacific Company as are the various signaling devices located at the crossing. Texas & New Orleans Railroad Company was a subsidiary of the Southern Pacific Company and, for purposes of convenience, both are referred to as Southern Pacific. The track is used almost exclusively by Texas & Pacific Railway Company. Hardgrave was aware of the existence of the railroad crossing, having crossed it various times in the past. A collision occurred between the the truck

and a train operated by the Texas & Pacific Railway Company at the crossing which resulted in personal injuries to both Hardgrave and McCleery.

Hardgrave and McCleery brought this action against the Texas & Pacific Railway Company, the Southern Pacific Company and Texas & New Orleans Railroad Company seeking damages for the personal injuries sustained by them. The Travelers Insurance Company filed a plea of intervention seeking to recover workmen's compensation benefits which it had paid to both Hardgrave and McCleery.

The case was tried before the court and a jury and submitted upon fifty-five special issues. The essential jury findings may be summarized thusly: (1) and (1A) that there was a collision between a truck driven by Hardgrave and the Texas & Pacific train at the South Lamar crossing on November 18, 1958; (2) that at the time and on the occasion in question the conditions surrounding the railroad crossing were such as to make it an extra-hazardous crossing; (3), (5) that Southern Pacific did not maintain gates or a flagman at the crossing but such failure was not negligence; (7) that Southern Pacific had sufficiently visible warning lights at the crossing; (9) that Southern Pacific failed to have a sufficiently audible warning bell at the crossing in question but (10) such failure was not negligence; (12), (13) that Southern Pacific failed to provide overhead lighting at the crossing in question but such failure was not negligence; (15), (16), (17) that Texas & Pacific was operating its train at a speed in excess of 12 miles an hour on the occasion in question and that such constituted negligence and a proximate cause of the collision in question; (18) that the operators of the Texas & Pacific train did not fail to sound the whistle on the locomotive in question; (20) that Southern Pacific did maintain a wigwag signal on the south side of the crossing which was in good working order (23) that the collision in question was not the result of an unavoidable accident; (24),

(25), (26) that Hardgrave failed to keep a proper lookout and that such failure was a proximate cause of the collision but was not the sole proximate cause thereof; (27), (29), (30) that Hardgrave drove the truck at an excessive rate of speed which was a proximate cause of the collision but was not the sole proximate cause thereof; (31), (32) that Hardgrave failed to apply his brakes properly and that such was a proximate cause of the collision; (34–37) that a clearly visible electric signaling device was given to warn of the immediate approach of the train in question before the truck reached a point 15 feet from the nearest railroad track; that when the railroad engine was approaching within 1500 feet of the crossing such engine gave an audible signal before the truck reached a point 15 feet from the nearest rail and that by reason of its speed or nearness to the crossing, the train was an immediate hazard; (38–41) that the train was plainly visible before the truck reached a point 15 feet from the nearest rail and was therefore in a hazardous proximity so that the failure of the truck to stop within not less than 15 feet of the nearest rail was a proximate cause of the collision but was not the sole proximate cause thereof. The remainder of the issues had to do with the amount of damages.

Based upon this jury verdict the trial court originally rendered judgment in favor of the passenger McCleery against the defendant Texas & Pacific Railway Company in the sum of $68,436.35. The judgment denied Hardgrave any recovery against any of the defendants. Thereafter the trial court withdrew the original judgment and sustained defendants' motion to disregard the jury's answers to Special Issues 15, 16 and 17. Judgment was therefore finally entered denying any relief to either Hardgrave or McCleery against any of the defendants. Both plaintiffs, and the intervenor, appeal.

Appellants predicate their appeal primarily upon the first two points of error

wherein it is contended that the judgment of the trial court should be reversed and rendered in favor of appellant McCleery because the trial court was not authorized by law to disregard Special Issues 15, 16 and 17 since there was legally competent evidence to support those issues and the answers thereto. The authority of a trial judge to disregard particular special issue findings of a jury stems from Rule 301, Texas Rules of Civil Procedure. While this rule expressly provides that the court may, upon proper motion, disregard the answers to certain special issues and render judgment for the movant on the remaining portion of the verdict, the test as to whether such answers should be disregarded is whether there is any evidence to support the answers. The reviewing court must determine that there was "no evidence" of probative force on which the jury could have made its findings. Shelton v. Ector, Tex.Civ.App., 364 S.W.2d 425; Burt v. Lochausen, 151 Tex. 289, 249 S.W.2d 194; Shelton v. Belknap, 155 Tex. 37, 282 S.W.2d 682; Davidson v. Methodist Hospital of Dallas, Civ.App., 348 S.W.2d 400. In determining the "no evidence" point we must view and interpret the evidence in the record in its most favorable light to the plaintiff and to the verdict rendered by the jury. Ford v. Panhandle & Santa Fe Ry. Co., 151 Tex. 538, 252 S.W.2d 561; Shelton v. Ector, Tex.Civ. App., 364 S.W.2d 425; Biggers v. Continental Bus System, Inc., 157 Tex. 351, 298 S.W.2d 79, 303 S.W.2d 359.

■■ Therefore, the principal question presented by this appeal is whether the record contains any evidence of probative force to support the jury's findings in response to Special Issues Nos. 15, 16 and 17 relating to the speed of the train. Appellees, both in their brief and in oral argument before this court, concede that there is ample evidence in the record that the Texas & Pacific train was traveling at a greater rate of speed than 12 miles per hour in violation of the city ordinance of the City of Dallas and that such conduct was negli-

gence. However, they contend that there is no evidence in the record to support the jury's findings to Special Issue No. 17 to the effect that such negligence was a proximate cause of the collision. Having narrowed the question to that of speed being the proximate cause of the collision it is essential that we carefully review all of the record relating to this point. This we have done in the light of the well established law that the judgment of the trial court must be reversed if there is in this record before us evidence of probative value which, with the reasonable inferences therefrom, will support the jury's findings of proximate cause. Hall v. Medical Building of Houston, 151 Tex. 425, 251 S.W.2d 497; Biggers v. Continental Bus System, Inc., 157 Tex. 351, 298 S.W.2d 79, 303 S.W. 2d 359. Moreover, as was stated by the Supreme Court in the Biggers v. Continental Bus System case, supra, we must approach a determination of the question in the light of the announced rule of the Supreme Court that appellate courts are without authority to set aside jury verdicts, particularly on questions of proximate cause in damage suits, upon conflicting facts—the undisputed facts must be ample and clear, and the circumstances most exceptional to justify such action. Liberty Film Lines, Inc., v. Porter, 136 Tex. 49, 146 S.W.2d 982.

■ Appellees defend the trial court's action in holding, in effect, that the speed of the train could not be a proximate cause of the collision as a matter of law upon the proposition that the crossing was already occupied by the train at the time Hardgrave drove the truck into the crossing. Appellants argue that this was not a situation of an "obstructed crossing" but was a case of an approaching train so that the jury's answer concerning the speed of the train being a proximate cause of the collision was justified by the evidence. In view of these conflicting positions we deem it necessary and desirable to set forth the following excerpts from the record which, in our opinion, settle the issue.

There were only two eyewitnesses to the collision, Hardgrave and McCleery. Hardgrave was driving the truck, without a trailer, known as a "bob-tail" truck which had an overall length of from 15 to 18 feet. McCleery was sitting on the right side in the passenger seat. Hardgrave was driving at an estimated speed of 15 to 20 miles per hour as he approached the crossing and said that when he was within 100 to 150 feet from the crossing he looked in both directions as far as he could see but saw nothing. He said he then turned his eyes to the road because, "if you are driving a bob-tail truck, you cannot keep your eyes off the road too long; if you do, you are going to be off it, and that road is rough." He said that when he arrived at a point which he estimated to be a distance of three or four truck lengths from the crossing he first saw the train. This would place him approximately 75 to 90 feet from the crossing. Upon seeing the train, he said he immediately applied his brakes and turned to the right in an effort to avoid it and the next thing he remembers is when he woke up in Parkland Hospital some time thereafter. On direct examination Hardgrave stated:

"Q. Mr. Hardgrave, when was the first time, or what brought to your knowledge that there was something going to happen, the first time?

"A. Well, the first knowledge I had was that train loomed up in front of me.

"Q. All right. What did you do?

"A. Got on my brakes and tried to stop.

"Q. Did you do anything else?

"A. Yes, sir. It seemed like I was trying to turn to the right. I don't know whether I did or not. I can't say whether I made it or not.

"Q. What happened after that, do you know?

"A. The next thing I knew I woke up in Parkland Memorial Hospital."

\* \* \* \* \* \*

"Q. Do you remember anything about the train itself?

"A. Yes, sir. It seems to have stuck in my mind, kind of a confused detail here, I remember seeing an egine it seems like, the back of an engine.

"Q. The back of an engine?

"A. Yes, sir.

"Q. Are you sure about that?

"A. Yes, sir. I've turned it over in my mind. I'm not sure, but it seems like I can remember the back of an engine.

"Q. Do you remember where it was coming from?

"A. No, sir.

"Q. Do you remember anything about how fast it was going?

"A. No, sir.

"Q. Do you remember seeing any lights, or anything of that nature?

"A. It's in my mind, I don't know where I got it from—I mean, it seems like I seen a light, a headlight of an engine, but I've turned it over in my mind, and I don't know how I could have seen the back of an engine and a headlight at the same time."

On cross-examination, he testified:

"Q. You've told the jury everything you remember about the accident?

"A. Yes, sir.

"Q. As a matter of fact, you claim you were about three truck lengths, or forty-five or possibly sixty feet away when you say you saw the headlight of the engine?

"A. Yes, sir. I know I seen the headlight of an engine. There is a light in my mind some place. Now Mr. Bickel, I don't know where it come from or what happened, but—

"Q. You don't know where the light came from or anything like that?

"A. No, sir, I don't know where the train come from either.

"Q. You knew the crossing was there, didn't you?

"A. Yes, sir.

"Q. You knew there was a wig-wag there?

"A. Yes, sir.

"Q. You don't know whether the wig-wag was working or not?

"A. No, sir, I do not. I didn't see it anyway.

"Q. Sir?

"A. I said, no, sir, I didn't see it anyway. I don't know if it was working or not.

"Q. You couldn't say it wasn't working?

"A. No, sir, I couldn't say it wasn't working.

"Q. As you approached the crossing, I assume there was nothing to alert you there was anything unusual?

"A. No, sir."

\*      \*      \*      \*      \*      \*

"Q. Five or six years. And you think you were three truck lengths, forty-five or sixty feet, from that crossing when you saw the engine entering onto the crossing, don't you?

"A. Well, I say it might have been three or four truck lengths. Now I don't know how far. I know it was awful close when it just loomed up in front of me. I don't know how far it was. I couldn't say that, only that's just an estimate.

"Q. You were in your own right hand lane, weren't you sir?

"A. Yes, sir.

"Q. Saw the engine entering the crossing to your left, didn't you?

"A. No, sir, I can't say that I saw it entering the crossing at the left. I seen something to the left, I don't know what it was.

"Q. You did see it enter the crossing from your left, didn't you sir?

"A. I seen something on the left. Now, I—

"Q. Entering the crossing?

"A. In the crossing. It seems like it was an engine or train or something. I don't know."

Counsel for appellees introduced in evidence a portion of the deposition of appellant Hardgrave given prior to the trial, a portion of which is as follows:

" 'Q. All right, sir, did you ever see the train that you had the wreck with?

" 'A. Yes, sir, just before—just before it happened. I seen it just immediately before that and I got on my brakes and I could see that I was going to have—I couldn't stop, I was going to have to turn or something, because it was just right on me, so I turned and got on my brakes, and that was the last I remember.

" 'Q. You turned right or left?

" 'A. Turned right.

" 'Q. What part of the train did you see when you saw it?' "

"MR. BICKEL: Turning to page 16.

" 'A. I believe the back of the engine when I seen it.

" 'Q. Was the train completely over the crossing at the time?

" 'A. No, sir. It wasn't—it was just —I seen I couldn't, you know, miss it, so I got on my brakes. I don't think the engine was across the tracks.

" 'Q. Across the tracks?

" 'A. No, I mean across the road. Yes, sir, at the time I seen it.

" 'Q. Was part of it on the road?

" 'A. No, sir, not when I seen it. Just right at the road.

" 'Q. Were any of the freight cars on the road?

" 'A. No, sir.' "

\* \* \* \* \* \*

" 'Q. All right. Can you tell us why you didn't see the engine before you did?

" 'A. Well, the best I can remember I glanced up and—'

"MR. BICKEL: Page 19.

" '—I glanced up and down the track. I didn't see anything and that road is kind of rough, and you ain't going to keep your eyes off driving a bob-tail truck, you ain't going to keep your eyes off the road too long anyway. If you do, you're going to be off it, and that road is rough. I glanced each way and I didn't see anything. I just kept going.

" 'Q. The headlight was on when you saw the engine?

" 'A. It was right on—pretty near the road when I saw it.'

"MR. BRICE: Pretty near on the road.

"BY MR. BICKEL:

" 'Pretty near on the road when I saw it.' And Mr. Besing says, 'You mean the truck headlights or the train?' Mr. Case says, 'Train headlight, the headlight on the train.' The witness says, 'That's what I'm saying, it was on.'

" Q. (By Mr. Case) Was it one of those that flashes back and forth?

" 'A. I don't remember that.

" 'Q. All right. How far from the track would you say you were when you saw the train?

" 'A. I couldn't tell you that, the distance.

" 'Q. Well, were you as much as the length of your cab, or more than that? I mean your tractor, or more than that?

" 'A. I was more than the length of the tractor—I mean, I just don't know how far it was.

" 'Q. I wouldn't hold you to it exactly, but would you say it was one or two or three times the length of the tractor, or just your best estimate?

" 'A. I couldn't say, but I would say it was more than three times the length of the tractor.

" 'Q. About how long would that tractor be?

" 'A. More than—got one hundred and sixteen inch wheel base. Say fifteen, eighteen feet. I don't know.

" 'Q. All right. And you think you were more than three times that distance back of the track when you saw it?

" 'A. Yes, sir, I would say so.' "

\* \* \* \* \* \*

" 'Q. And how far from the road do you say the head of the engine was when you first saw it?

" 'A. Well, it was almost on me.

" 'Q. Almost on the road?

" 'A. Yes, sir, when I seen it.

" 'Q. And is it fair to say that you didn't see the engine before you did is just because you weren't looking in that direction?

" 'A. No, sir. Like I say, I just glanced up and down the track, you know, and didn't see anything, and then I just got my eye back on the road.' "

McCleery could not give very enlightening testimony concerning the facts surrounding the collision. He was looking at the road but said he heard no bell and saw no signal light. He said he could see across the crossing until about the last moment when he heard Hardgrave say: "There is a train." And the next thing he recalls was being in Parkland Hospital.

The physical evidence shows that the front part of the truck came into contact with the train and the impact apparently caused the truck to turn completely around so that there was damage both to its rear and front. After the impact the truck was dragged to the right and completely turned around and while being dragged the truck had knocked down a signal pole.

Mr. Bright, the engineer who was operating the train, testified that he was on the right hand side of the engine looking out but that he never saw the approaching truck; that he did not know that there had been a collision until he was advised by a message after he had passed through Dallas. He took the train on into Mineola but did not inspect the train for damage after he got off of the train. Mr. Bright testified that he was familiar with the crossing in question and knew that it was in the city limits of the City of Dallas which had regulated speed limits for trains at 12 miles per hour. He testified that at the time he passed this crossing and during the entire time he was making the U-curve he was operating the train at a speed of 25 miles per hour. Bright testified that the train consisted of 129 or 130 cars being pulled by several engine units. The cars would average about 50 feet in length. He testified that it would require a distance of seven, eight or perhaps as many as ten car lengths to stop a train like the one he was driving at a rate of speed of 25 miles per hour. Bright said that at the speed at which he was operating the train he could not, because of the obstructions to the South, or to his right, stop within the range of visibility if he had

suddenly seen a truck or car proceeding North on Lamar Street.

The witness Holloway testified that he made an investigation of visibility and found that at 120 feet south of the crossing the maximum trackage visibility to the West is 96 feet; at 110 feet visibility is 114 feet; at 100 feet visibility is 150 feet and at a point 90 feet south of the crossing the maximum trackage visibility to the West is 234 feet.

Witness Morris, a signal engineer with appellee Southern Pacific, testified that as the train came down the track it passed over a circuit of electricity which caused a relay in another circuit which sets in operation the wig-wag signals at the crossing. This relay is at a point 983 feet from the crossing. He further testified that when a train is traveling at a speed of 25 miles per hour the motorist on the highway will receive less than half the period of warning that he would have received had the train been traveling within the speed limit of 12 miles per hour.

The train employees at Mineola made an inspection of the train and estimated that the damage appeared to be some 12 to 17 cars back from the front of the engine. Cross-examination of the witnesses cast some doubt concerning this evidence of damage.

From a careful review of the entire record, and from the quoted testimony above, it is quite evident that we cannot say that this accident occurred when the crossing was obstructed by the train. Neither can we say, as a matter of law, that there was no evidence in this record to support the jury's finding that the speed of the train was a proximate cause of the collision. While Hardgrave's testimony is far from being satisfactory, it does, together with reasonable inferences, present the question for the jury's determination whether the train was approaching the crossing at the same time Hardgrave approached it. The jury was justified in believing that if Hardgrave could see the

the train when he was from 75 feet to 90 feet from the crossing (which would give Hardgrave a visibility of 234 feet to the West) that the train operator would have been in a position to have seen Hardgrave approach the track and had he been traveling the legal rate of speed of 12 miles an hour, instead of twice that speed, the engineer would have had an opportunity to stop the train or Hardgrave would have had an opportunity to cross ahead of the train. Moreover, a slow rate of speed would have prolonged the wig-wag signals and thereby have reasonably afforded approaching motorists an opportunity of seeing and heeding the same.

Our Supreme Court in Galveston, H. & S. A. Ry. Co. v. Wells, 121 Tex. 310, 50 S.W.2d 247, clearly enunciated the general rule with reference to the question of speed as being a proximate cause of a collision:

"Likewise, it is held that, where a person has been injured or killed at a much-traveled crossing, in close proximity to buildings or other obstructions, and at which there were obstructions to the view of the traveler or those operating the train, the question of whether the railroad was guilty of running its train at an excessive and dangerous rate of speed was an issue of fact for the jury to determine."

Other cases discuss the same question and conclude that the issue of proximate cause in such a case is ordinarily one for the jury. See Texas & Pacific Ry. Co. v. Midkiff, Tex.Civ.App., 275 S.W.2d 841; Texas & N. O. R. Co. v. Leach, Tex.Civ.App., 49 S.W.2d 866; St. Louis Southwestern Ry. Co. of Texas v. Cockrill, Tex.Civ.App., 111 S.W. 1092; and Burlington-Rock Island R. Co. v. Ellison, 140 Tex. 353, 167 S.W.2d 723.

In our opinion the decision of this case is governed by the case of Biggers v. Continental Bus System, Inc., 157 Tex. 351, 298 S.W.2d 79, 303 S.W.2d 359, which in-volves a collision between a Continental bus which was being driven on its own proper side of the highway with an automobile which had been propelled across the highway and into the bus. The question of whether the speed of the bus could, as a matter of law, constitute a proximate cause of the collision, and the resulting injuries, was paramount in this appeal. The jury found that the driver of the bus was guilty of negligence in driving the same at a speed in excess of 55 miles an hour and that such was negligence and a proximate cause of the collision. The Court of Civil Appeals reversed the trial court's judgment holding that, as a matter of law, none of the negligent acts of the bus driver, including speed, was a proximate cause of the collision. The Supreme Court, in an opinion by Justice Calvert (now Chief Justice of the Supreme Court) reversed the Court of Civil Appeals and held that the evidence presented an issue of fact as to whether speed was a proximate cause. After reviewing the various elements of proximate cause and also analyzing the testimony in great detail the Supreme Court held that if the bus had been traveling at a reasonable rate of speed the collision would not have occurred. Recognizing that a detailed analysis of opinion testimony of time and distance in reconstructing an automobile collision and the events immediately preceding it may not reflect the true situation, the court said: " * * * it is a means of reconstruction which cannot be denied to a jury, and if that method of reconstruction will support the verdict of the jury our duty leaves us no alternative but to adopt it." The court also said: "It is a sufficient predicate of Continental's liability that the excessive speed of the bus was a substantial factor in bringing about the collision. Hopson v. Gulf Oil Corp., 150 Tex. 1, 237 S.W.2d 352, 355."

When we make a reconstruction analysis of the facts set forth in this record, as was done by the Supreme Court in Biggers, we find a striking parallel situation which

leaves no doubt in our minds but that the rule announced in Biggers is applicable here. Accordingly, we hold that there was evidence of sufficient probative force to justify the submission to the jury of Special Issues 15, 16 and 17 and also to justify the jury's answers thereto. This being true, the trial court erred in disregarding and setting aside the answers of the jury to the numbered special issues and in rendering judgment against McCleery.

In this connection it must be observed that appellant McCleery was a passenger in the truck and there were no jury findings which convicted him of contributory negligence. Appellees make no contention that he was negligent in any manner which proximately caused the collision in question. Moreover, the jury refused to find various causes to be the sole proximate cause of the collision and therefore McCleery is not barred from recovery by the contributory negligence finding against the driver Hardgrave. Dallas Ry. & Terminal Co. v. Bailey, 151 Tex. 359, 250 S.W.2d 379.

Appellees have presented seventeen cross-points of error which assert that if the trial court was in error in setting aside the jury findings, as contended by appellants, that the case should be reversed and remanded for a new trial and not reversed and rendered.

By their first and second cross-points appellees say that if the district court erred in disregarding Special Issues 15, 16 and 17 then the judgment against appellant McCleery should be reversed and remanded for a new trial, and not reversed and rendered, because the evidence is factually insufficient to support the jury's answers to said issues or such answers are so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust. Having carefully analyzed the record as a whole we agree with appellees that the evidence is legally insufficient to support the jury's answer to Special Issue

No. 17 to the effect that the speed of the train was a proximate cause of the collision. For that reason we think that the trial court should have granted appellees' motion for new trial based upon this assignment of error and hence we reverse and remand the cause for a new trial, rather than reverse and render the same in favor of McCleery, as requested by him.

Such disposition of this appeal renders it unnecessary that we discuss or pass upon appellants' fourth point of error which complains of the failure of the trial court to submit an issue of improper lookout as against the operator of the train nor is it necessary that we pass upon and consider appellees' cross-points, all of which deal with procedural matters which will probably not occur upon another trial of this case. It might be appropriate to comment that upon another trial of this case the trial court should refrain from submitting the damage issues in such a manner as to possibly allow the recovery of double damages and in this connection attention is directed to a comment by the Supreme Court in International & G. N. Ry. Co. v. Butcher, 98 Tex. 462, 84 S.W. 1052. See also Yessler v. Dodson, Tex.Civ.App., 104 S.W.2d 95, and Galveston, H. & S. A. Ry. Co. v. Perry, 36 Tex. Civ.App. 414, 82 S.W. 343.

Appellants bring forth no points assailing the "take nothing" judgment against Hardgrave nor the denial of liability against Southern Pacific and Texas & New Orleans Railroad Company. Since the two causes of action are severable, and since the suit of Hardgrave has been fully developed and settled, the judgments in these respects should be and are affirmed.

The judgment of the trial court denying appellant McCleery any recovery against Texas & Pacific Railway Company is reversed and here remanded for a new trial. The judgment of the trial court denying McCleery recovery against the Southern Pacific and Texas & New Orleans Railroad Company as well as denying recovery by appellant Hardgrave against either of

appellees, is affirmed. All costs are assessed against appellee Texas & Pacific Railway Company.

Reversed and remanded in part and affirmed in part.

BATEMAN, J., disqualified and not sitting.