LAND, J.
This is a suit for damages for personal injuries sustained by the plaintiff in a collision at a street intersection between an electric car and a carriage in which she was riding.
Plaintiff alleged that the carriage belonged to the defendant John A. Barrett, and that she was a passenger therein for hire, and that the collision was occasioned by the negligence of the driver of the carriage in attempting to cross the street in advance of the rapidly approaching electric car, and by the negligence of the motorman in approaching Third street at a high and unlawful rate of speed, without sounding his gong, or giving other warning, and in not having his car under control, and not paying attention to the sign, “Go slow,” on the downtown side of said street.
The defendant railway company, after pleading the general issue, admitted the collision, denied negligence on its part, and charged that the accident was due solely to the gross negligence of the driver of the carriage in driving rapidly on the street car track, without stopping o;r checking his horses, or taking any precautions to ascertain the presence of the car. The defendant Barrett pleaded the general issue.
The ease was tried before a jury, which, by vote of nine to three, found a verdict for $700 against the defendant railway. Judgment was rendered pursuant to the verdict, and in favor of the defendant Barrett, rejecting the plaintiff’s demand against him with costs.
The railway company rules the plaintiff and its codefendant to show cause why a new trial should not be granted. The rule was heard and made absolute, and the court ordered that the judgment be set aside and that a new trial be granted. The trial judge gave for his ruling the following reasons:
“The evidence shows that the negligence of the driver of the carriage owned by John A. Barrett caused the accident; if not the sole cause, it contributed to the accident.
“The court could understand the jury holding both the railroad and Barrett negligent, and condemning both in solido or rendering a verdict against Barrett alone. If such a verdict had been rendered, the court would not have set the verdict aside. The verdict against the railroad company alone is clearly contrary to *213 the evidence, the law, and the charge given to the jury. The defendant the New Orleans Railway & Light Company is entitled to a new trial, and a new trial is granted.”
The new trial was granted on February 8, 1911, and the cause was refixed for trial. ■On May 29, 1911, the day on which the case was called for trial, counsel for Barrett, suggesting that no motion for a new trial had been filed by the plaintiff, and that the judgment in favor of Barrett had become final and should be signed, moved that he be dismissed from further participation in the trial. The motion was refused.
On the second trial there was a verdict and judgment in favor of the plaintiff for $700 against both defendants in solido. As On the former trial, the verdict was found by nine jurors.
Both defendants have appealed. Plaintiff has filed a motion to dismiss the appeal of Barrett, but this motion is not referred to in the brief of plaintiff’s counsel, and it is without merit.
[1] The first question to be considered is as to the alleged error of the judge in granting a new trial of the cause as between the plaintiff and the defendant Barrett. It is well settled that an application for a new trial is in time, after three judicial days, if judgment has not been signed. Marchand v. Noyes, 33 La. Ann. 882. It is equally well settled that judges may ex officio grant new trials within the same delays allowed to parties to move therefor. Culverhouse v. Marx, 38 La. Ann. 667; State v. Blackman, 110 La. 266, 34 South. 438. The judgment had not been signed, and hence it was not too late for the judge to grant a new trial on his own motion.
The accident happened on December 24, 1909, about 5 o’clock in the evening. Plaintiff and three other ladies occupied the same carriage, which with a number of other carriages had constituted a funeral procession to one of the cemeteries. All of these carriages were returning by way of Third street, which was paved with asphalt, and furnished a convenient roadway for vehicles passing across that section of the city. At the intersection of Third and Baronne streets, carriages and other vehicles were compelled to cross the tracks of the defendant railway. At this point the view from both streets is obstructed by buildings, and the danger of collision between electric cars and vehicles induced the defendant company to place a “Go slow” sign in the street to warn their motormen. On the evening in question, some of the carriages referred to had crossed Baronne street, and the carriage in which the plaintiff was riding was approaching the crossing, when an electric car was seen coming up Baronne street. The driver of the carriage saw the car in time to stop, but took the chances of crossing before the car reached the intersection of the streets. He miscalculated, and the ear struck the rear portion of the carriage, which was tilted over against a post in the street. The plaintiff was shaken up by the jar, and was injured in one of her shoulders.
It is admitted that the car was coming up Baronne street at full speed, but there is no evidence to show that the speed exceeded the limit prescribed by city ordinance. No more ordinary care was required of the motorman than the sounding of the gong and the slackening of the speed as the car approached the crossing. Brown v. Railroad, 42 La. Ann. 354, 7 South. 682, 21 Am. St. Rep. 374. The conductor and the motorman testified that the gong was sounded, and that the speed was slowed down at a point 80 or 100 feet from Third street. A passenger on the car, who was at the time reading a newspaper, heard the collision, and on looking up observed that the car was moving slowly, and saw the driver of the carriage on the ground, picking himself up, and the horses •trotting or running away. A more observant *215 passenger testified that the car was going at the usual rate of speed, and as it reached Third street he noticed the car slack up in. speed and heard the gong sounded by the motorman. A lady living on Third street next to the corner of Baronne testified that she heard the motorman sound his gong at Second street. The witness was expecting her daughter, who was employed at one of the Canal street stores.
The plaintiff testified that she saw the car half a block away; that it was running very fast; that no gong was sounded; and that no attempt was made to check the speed. Another lady testified to the same effect; but, as she did not see the car until just about the moment of the collision, she had no opportunity of observing its speed or management. Mrs. Burns, a companion of the plaintiff in the carriage, and who also has a damage suit against the defendant railway for alleged injuries resulting from the same collision, testified that she saw the ear about half a block away, and the first thing she knew one of the ladies in the vehicle cried out, and the car hit the carriage, and the witness saw the car, coming fast, at good speed, before the carriage came to the corner of the street, and heard no gong sounded. She estimated that six seconds elapsed between the time she first saw the car and the time of the collision. Mrs. Garner testifies that she saw a train of carriages passing, and, expecting a collision, looked down Baronne street and saw the car coming rapidly, but did not see the carriage in question until it was on the track. The witness testified that the ear did not slow up, but was not questioned about the sounding of the gong. Prom the driver’s testimony it is evident that he did not see the car until a few moments before the collision. His statement that the car was a block away as he drove into Baronne street is contradicted by a number of witnesses on both sides, and | the fact that the car could not have possibly traversed the intervening distance in time to collide with the carriage.
A colored chauffeur testified that the car on the occasion in question was speeding at the rate of 12 to 14 miles an hour and did not slow up before the collision, and that the motorman did not sound the gong.
Defendant Barrett testified that the damage to the carriage as the result of the collision was one or two spokes broken in each of the hind wheels, molding broken and dented, panel of the door broken, rubber tire knocked off, and some other minor damages, including broken harness.
The carriage was not too badly damaged for emergency use, as shown by the fact that the plaintiff rode home in the same vehicle. The ear stopped at the upper line of the intersection of Third street.
It was the duty of the motorman to sound his gong and to slacken his speed as he approached Third street. The motorman and conductor testified positively that these duties were performed, and they are corroborated by a passenger on the car, and as to the sounding of the gong all three are corroborated by Mrs. Germain. The small damage done to the carriage and the short stop are corroborative of the testimony to the effect that the speed of the car had been slowed down. The testimony of plaintiff and her witness that the gong was not sounded is negative in its character. They may not, from inattention or other cause, have heard the sound of the gong. It is most difficult for even an expert in front of an approaching electric car to estimate its rate of speed. The ladies in the carriage were not in a favorable position to observe the car. They were talking, and could not see the .car except by glancing sideways. The car was close on them, yet they thought it was half a block away. Another lady did not see the *217 car and carriage until about the' moment of the collision. This leaves but two witnesses for the plaintiff, who, according to their own statements, had the time and opportunity to observe the speed of the car. One of these was expecting a collision before she saw the car.
[3] The evidence in favor of the railway company is positive and affirmative as to the precautions taken to avoid the accident. The evidence in favor of the plaintiff on the same issues of fact is negative in character, conflicting, and unsatisfactory in many respects. Under such a state of facts, the affirmative carries with it a preponderance of proof. Ponsano v. Railroad Co., 52 La. Ann. 247, 26 South. 820.
[2] The accident was due to the negligence of the driver of the carriage, who was an employé of the defendant Barrett, who, however, denies liability on the ground that he had hired the outfit to an undertaker, who in his turn had hired to a lady, who in her turn had hired one of the seats to the plaintiff.
Counsel contends that Barrett is not liable in damages to the plaintiff, with whom he had no contractual relations whatever.
It appears from Barrett’s testimony that he hired the carriage to an undertaker for the day of the funeral, and that there was no special contract between them as to the control of the driver.
Counsel relies on the doctrine thus- announced by Mr. Thompson, in his work on Negligence ([2d Ed.] § 581), as follows:
“But where A 'hires his team and driver to B under a contract by which B has as much control over the driver as though he had originally hired his team, it has been held -that the driver is, for the time being, the servant of B and not the servant of A, and B and not A must answer for damages caused by negligent driving.”
The case of Brown v. Smith, 86 Ga, 274, 12 S. E. 411 [22 Am. St. Rep. 456], cited by Mr. Thompson as authority- for the text supra, was based on evidence of a contract of hiring of a driver and pair of mules, which gave the lessee the right to discharge the driver and to employ another in his place, and to put the driver at other work. The lessee, in the words of the court, “had as ample and complete control over the driver as if he had originally hired him.” Under this state of facts, the court held that the lessor of the mules and driver was not responsible for injury to a third person occasioned by the negligence bf the driver in the discharge of the duties of his employ-, ment. In that case, the court recognized the general rule that:
“Where a master allowed his servant to be hired by another, he remains liable to the hirer and to strangers for negligence of such servant.”
Mr. Thompson, in the section quoted supra, states the rule as follows:
“If A hires his team and driver to B to work for B, and during the bailment a third person is injured by the negligence of the driver, A will be liable to make good the damages and not B.”
The same writer further says:
“A livery stable keeper is, accordingly, liable for the negligence of his driver while temporarily engaged in the service of an undertaker.” Section 582.
As the master is responsible for the negligence of the servant acting within the scope of his employment, such responsibility continues as long as the servant is subject to the orders and control of the master, and is liable to be discharged by him for disobedience of orders or misconduct. Wood, Master and Servant, § 317. In other words, as long as the relation of master and servant exists, the liability of the former for the negligence of the latter continues in full force and effect. In the case at bar, the *219 driver was tile servant of the defendant Barrett at the time of the accident. The contract between Barrett and the undertaker was merely the ordinary hiring of the services of the driver for a few hours.
[4] The evidence as to the nature and extent of the injury sustained by the plaintiff is as follows: One experienced doctor made an examination and found no external evidence of injury, and no impairment of the motion of the shoulder. Another doctor found a subluxation, or slight sprain of the shoulder, which disappeared completely after a treatment of two weeks. No bandages were applied, but the plaintiff kept her bed. At the end of this time, the doctor found the arm in good shape, and it appeared to him that the functions of that member had been restored. The doctor also treated the plaintiff for nervousness, but could not say that this condition was caused by the accident. The plaintiff and her daughter testified that the former had lost to a certain degree the use of her arm. This testimony is discredited by the statements of the two doctors, as far as such impairment of motion may be attributed to the slight injury of the shoulder. The same may be said of the nervousness of which plaintiff complained.
In the light of the evidence as to the nature of the injury, we consider that the verdict is excessive.
It is therefore ordered that verdict and judgment below be amended by reducing the principal amount thereof against the defendant Barrett to the sum of $350; and it is further ordered that the judgment below against the defendant railway company be reversed, and that plaintiff’s suit as against said defendant be dismissed with costs; and it is further ordered that said judgment as thus amended and reversed, in part, be affirmed, and that the costs of appeal be paid, one-half each, by the plaintiff and the defendant Barrett.