## HILGENBERG et al. v. ELAM.

### No. 2526.

Court of Civil Appeals of Texas. Eastland.

Jan. 25, 1946.

Rehearing Denied Feb. 22, 1946.

Smith & Eplen and Scarborough, Yates & Scarborough, all of Abilene, for appellants.

House, Mercer, Edwards & Irvin, of San Antonio, and T. J. McMahon, of Abilene, for appellee.

GRISSOM, Justice.

Mrs. Eva C. Hilgenberg and Mrs. Mary Hilgenberg, surviving wife and mother, respectively, of L. W. Hilgenberg, deceased, sued A. R. Elam for damages caused by his death. L. W. Hilgenberg and Alton J. Willingham jointly owned a farm. Part of the farm had a growth of trees which the owners wanted uprooted. Baldridge & Son owned a bulldozer. They leased it with a driver to Elam. Baldridge & Son selected the driver and paid all the operating expenses and for repairs. The operator of the bulldozer was hired and paid by Baldridge & Son, and they alone had the power to discharge him. Baldridge & Son leased the machine with the driver to Elam for $6.25 an hour. Elam was engaged as a contractor in building slush pits in the oil fields. When he did not need the machine and its operator in his business he would sublease the bulldozer, together with the driver, to any farmer or rancher needing it. Elam subleased the machine with the driver to Willingham and Hilgenberg for $8.50 per hour. While the bulldozer, driven by Bennett, was knocking down trees pointed out by Mr. Hilgenberg Bennett backed the bulldozer over Hilgenberg and killed him.

Plaintiffs alleged that Bennett was the servant of Elam at the time Hilgenberg was killed; that Elam was an independent contractor, engaged in operating the bulldozer on an hourly basis, and that Hilgenberg's death was caused by the negligence of Elam's servant or employee, Bennett, and that Elam, therefore, was liable for

damages suffered by plaintiffs as a result of Bennett's negligence. Elam answered that Bennett was not his agent, servant or employee while he was working on the Willingham-Hilgenberg farm; that he was the servant of Willingham and Hilgenberg; that Willingham and Hilgenberg had complete control of the work, with the right of directing not only the work to be done, but the means and details of its accomplishment; that they had the right to point out not only what should be done but how it should be done; that the bulldozer was owned by Baldridge & Son and its operator, Bennett, was employed and paid by them; that Elam merely leased the bulldozer and Bennett to Willingham and Hilgenberg; that Elam was, at most, a broker, or lessee from Baldridge and Son and lessor to Willingham and Hilgenberg; that in doing the work on said farm Bennett was not Elam's agent, servant or employee. Defendant further alleged that Hilgenberg was guilty of contributory negligence.

Defendant filed a motion for an instructed verdict, based, in substance, upon the grounds alleged in his answer as heretofore stated. Said motion was granted and judgment was rendered for the defendant. Plaintiffs have appealed.

Plaintiffs contend (1) that whether Bennett was the servant of Elam, and (2) whether Hilgenberg was guilty of contributory negligence were questions of fact which should have been submitted to the jury.

In making the trade with Elam for use of the bulldozer and driver, Willingham and Hilgenberg acted through Willingham. Mr. Willingham was called as a witness by the plaintiff. He testified, in substance, that he, acting for himself and Hilgenberg, leased the machine with the driver from Elam, agreeing to pay therefor $8.50 per hour; that through the middle of the farm there was a creek with heavy timber and brush; that the first day the bulldozer was operated on their farm they had all the timber removed; that they decided this was too expensive; that they started opening up lanes through the timber; that at first Willingham and Hilgenberg had the driver of the bulldozer pile the brush and timber together; that they concluded this was too expensive, and began just knocking the trees down and running over them and making a circle around any tract they wanted opened up; that they were plan-

ning to dig a tank on the farm and had made a contract with Mr. Thomas to build the tank; that the location of the tank site had been staked out by the oil conservation authorities; that in surveying the tank site it was necessary to clean the brush and trees out of the draw where the tank was to be built; that on the day Hilgenberg was killed Mr. Hilgenberg had Mr. Glaze, who was working for Mr. Willingham, "go after the bulldozer and operator to clean out that new prospective tank site." Willingham testified that Bennett had physical control of the machine; that he and Hilgenberg had the right to show Bennett where to work and what to do; that so far as the movements of the machine were concerned Hilgenberg and Willingham "had nothing to do with that, except to point out the directions and places where he wanted it cleaned"; that Willingham and Hilgenberg pointed out the trees they wanted knocked down if Bennett wasn't operating just where they wanted him to. He testified:

"Q. In other words, you would stop him and tell him 'I want this done?' A. Yes, if I wanted to.

"Q. And I believe you testified back here, first you had the trees knocked into piles? A. Yes.

"Q. And then later you changed your method? A. That's right.

＊          ＊          ＊          ＊          ＊

"Q. Mr. Willingham, in your trade with Mr. Elam was it understood that you were going to direct the man or send somebody there to direct the man as to what to do and how to do it? A. It is entirely possible that we did for starting the machine, but as far as keeping a man on the job, no.

"Q. Your deposition was taken by agreement of the parties, in this Court House, on September the fourth, 1944, was it not? A. That's possible.

"Q. I will ask you if this question was not asked you at that time, by myself; ＊ ＊ ＊ 'Q. How long had Mr. Hilgenberg been directing the driver?' A. For a time. I could not tell you. He directed him the last few times—last few days he was down there. He had made several trips down there and directed the driver.

＊          ＊          ＊          ＊          ＊

"A. The same driver, Mr. Hilgenberg had directed at different places over the farm.

"Q. The same driver he had directed different places over the farm? A. Yes, sir.

"Q. You mean by that he would tell him what trees he wanted taken out? A. Yes, sir.

"Q. Or approximately what trees he wanted taken out? A. Yes, sir.

"Q. He would tell him exactly how far he wanted him to go and when he wanted him to stop, I believe you said? A. Approximately that, Mr. House.

"Q. That's your answer. 'A. Approximately that, Mr. House.' Quite often he would start him through a pile of timber and tell him to clean out a path all of the way through. Head him in the direction he wanted him to go. Naturally he would not walk by and show him every tree at that time. He would give him the direction.

\* \* \* \* \*

"'Q. But if he missed a tree and he wanted it out he would tell him what to do about it?' A. Yes, sir.

"Q. He was there to do whatever Mr. Hilgenberg wanted done? A. Yes, sir.

"Q. And Mr. Hilgenberg had full control in telling him what to do? A. Anything that Hilgenberg said was satisfactory with me.

"Q. Satisfactory to you? A. Yes, sir.

"Q. And you meant the driver—A. Naturally so.

"Q. —to act accordingly? A. Yes, sir.

"Q. And obey whatever he told him to do in regard to it? A. That's right.

"Q. That was your understanding with Mr. Elam? A. Mr. Elam knew—did not know that I had a partner on the farm, as far as I know.

"Q. I see, but as far as your trade with Mr. Elam was concerned, Mr. Elam understood that you were going to direct that man or send somebody there to direct him? A. That's right.

\* \* \* \* \*

"Q. And you knew that all Mr. Elam had to do with it was that he was to get paid so much an hour? A. Right.

\* \* \* \* \*

"Q. And that's the facts about it? A. As far as I can remember, yes, sir.

"Q. Then your understanding with Mr. Elam was that you or you would have somebody there to direct and tell the driver exactly what to do and how to do it, wasn't it?

\* \* \* \* \*

"The witness: The understanding with Mr. Elam that I had was that I would start him off in direction and any change in the future—I had understood with Mr. Elam to be there and show him where to start or to have someone there to show him where to start his work, but as far as keeping someone on the job all of the time it was not the agreement.

"Q. Didn't say whether he did or not? A. No, sir.

"Q. But your understanding was also that if Mr. Hilgenberg was out there and told this boy to do something, he was supposed to do it wasn't he? A. That's right."

The defendant Elam, called by the plaintiff, testified that he had the bulldozer with a driver leased from Baldridge & Son; that Baldridge & Son hired the driver of the bulldozer, paid him and alone had the power to discharge him; that Baldridge & Son paid all expenses of operating the machine and repairing it. He further testified:

"Q. You mean you didn't have anything to do with the operation of the machine, is that what you mean? A. In his spare time I would lease him out or hire him out to ranchers or anybody who wanted to do tanking.

"Q. What I am trying to find out is, who was this fellow Bennett working for you or Baldridge? A. He was working for Baldridge.

\* \* \* \* \*

"Q. During the time that you had that machine leased from Baldridge, you could rent it out to a farmer or to a stockman or to anybody else that you saw proper? A. I contracted this work in the oil field, and in my idle time I would lease any rancher or any farmer who wanted any of that work done the machine.

"Q. And the driver? A. Everything like it went. He to work it and to do whatever he wanted to; he to supervise this machine and do anything he wanted to do with it.

"Q. Mr. Elam, you don't mean that the farmer was to supervise the machine other than to direct where and how it was to be used? A. Well, to have done what he

wants done. In other words, I know nothing about tanking. I know nothing about grubbing trees, except what little I have watched. That's out of my line. Therefore if a farmer wanted something done I would turn the machine over to him; go out there and he would pay so much an hour for all of the time the machine worked.

"Q. That's the question, did you turn it over to him? A. I certainly did.

"Q. Or did you lease him the machine to do certain work with? A. I don't know what you would call the difference between a lease or turning it over. I would send the machine out to a man's place.

\* \* \* \* \*

"Q. What I want you to do is to tell us who had, who directed the movements of that machine? A. The man I sent it out to.

"Q. Do you mean that he had charge of the mechanical operation of it? A. I imagine the operator upon the machine had the mechanical operation under his supervision.

"Q. When you say 'supervision' you simply mean that the man that had leased the machine could direct the work that was to be done? A. Yes, sir.

\* \* \* \* \*

"Q. In other words when you made the agreement with them you furnished the machine and the man to operate it? A. Everything was furnished.

"Q. The gas and oil and everything else? A. To do with as he sees fit.

"Q. That's the way you handled it? A. Yes. The machine and the operator.

\* \* \* \* \*

"The witness: The machine and the operator is out there at his disposal to do what he directs them to do. I have nothing to say about it.

\* \* \* \* \*

"Q. When you say Mr. Hilgenberg was directing his work you mean by that he was telling him the trees he wanted pushed over? A. He was working under Mr. Hilgenberg's instructions.

"Q. But he was pushing over the trees that Mr. Hilgenberg was telling him to push over wasn't he? A. I suppose so.

"Q. Don't you know that's what he was doing? A. He was doing lots of work there. Mr. Hilgenberg was directing him so it was not only that it was various things he was doing.

"Q. He was not telling the operator how to operate the machine other than to tell him what to do, that is, what trees to push over and what brush to cut or whatever work he had him to do? A. I don't know exactly what he was—when I am out on the job I tell the man how to push some trees out.

"Q. How to do it? A. Yes, sir. I sure do or what other work to be done and it just depends on how I want it done."

Willingham and Elam were the only witnesses as to the agreement between them for the lease by Elam to Willingham and Hilgenberg of the bulldozer with the driver.

It is undisputed that neither Elam nor Willingham and Hilgenberg had authority to discharge the driver of the bulldozer; that if either of them was dissatisfied with the manner in which the work was being done by him they had the choice of terminating the lease of both the machine and driver or attempting to persuade Baldridge & Son to get a new driver.

■ Elam alleged in his motion for an instructed verdict that there was no evidence that at the time Bennett killed Hilgenberg Bennett was Elam's servant. Of course, if there is no evidence that Bennett was then the servant of Elam, the action of the court in instructing a verdict for defendant was proper. The test by which it may be determined whose servant Bennett was at the time is who had the right to control Bennett as to the manner in which he did the work. It is undisputed that Bennett was not selected by Elam as the operator of the bulldozer; that Elam did not pay him and did not have the right to discharge him. The record does not show that Elam was ever on the Willingham-Hilgenberg farm or that he ever attempted to direct the manner in which Bennett operated the machine or did the work on that farm, and there is no evidence that under the contract made by Elam and Willingham, Elam had the right to do so. Elam testified that he knew nothing about building a tank or removing trees. Willingham and Hilgenberg had a contract with Mr. Thomas to build the tank. When the bulldozer and driver came to the farm, Willingham and Hilgenberg frequently changed their minds as to how

much brush and timber was to be removed, where it was to be removed, where the tank was to be dug and matters of that nature. There is nothing in the record indicating that Elam agreed to build a tank, or to clear a certain tract of land or portion thereof of brush and trees. According to plaintiffs' witness, Willingham, Elam had nothing to do with the work on the Willingham-Hilgenberg farm except to sublease to them the bulldozer with the driver and receive therefor $8.50 for each hour the machine was in operation.

■ The general rule is stated in 42 C.J. 1097, sec. 859, as follows: "Where the owner of a motor vehicle transfers it with its driver to the service of a third person, liability as between him and the third person for the negligent acts of the driver in operating the vehicle depends upon which of them had at the time the right to control the driver in the performance of his duties not merely as to the result to be reached but as to the method of reaching the result. If the owner has retained such control he remains responsible for the acts of the driver, although the driver is accompanied by the third person, or by his servant, or although the third person has the right to control the route and destination, or the loading or unloading of the vehicle. On the other hand, he is not responsible where the driver is at the time of the alleged negligent acts under the exclusive control of the person to whom the vehicle and driver have been furnished."

See also 39 C.J. 1277, sec. 1463; 71 C.J. 408, sec. 144; 35 Am.Jur. 1012, sec. 578; Wissner v. Hartmann, 206 App.Div. 1, 200 N.Y.S. 408; Stewart v. California Imp. Co., 131 Cal. 125, 63 P. 177, 52 L.R.A. 205, 208; Wagner v. Larsen, 174 Wis. 26, 182 N.W. 336; Antonelly v. Adam, 175 Minn. 438, 221 N.W. 716, 718; Lacombe v. Cudahy Packing Co., 103 N.J.L. 651, 137 A. 538, 540; Yelloway, Inc. v. Hawkins, 8 Cir., 38 F.2d 731; Meyers v. Tri-State Automobile Co., 121 Minn. 68, 140 N.W. 184, 44 L.R.A.,N.S., 113, 119; Balinovic v. Evening Star Newspaper Co., 72 App.D.C. 176, 113 F.2d 505, 506; Ramsey v. New York Central Railroad Co., 269 N.Y. 219, 199 N.E. 65, 102 A.L.R. 511; Philadelphia & R. C. & I. Co. v. Barrie, 8 Cir., 179 F. 50, 53.

Under the facts there is no implication that Elam retained the right to control the driver for the purpose of protecting the machinery operated by him. Restatement of the Law of Agency, p. 502, sec. 227; Shepard v. Jacobs, 204 Mass. 110, 90 N.E. 392, 26 L.R.A.,N.S., 442, 444, 137 Am.St.Rep. 648; Burton v. Galveston, H. & S. A. R. Co., 61 Tex. 526, 534; 8 C.J.S., Bailments, § 40, p. 319; Morris v. Trudo, 83 Vt. 44, 74 A. 387, 25 L.R.A.,N.S., 33, 36; Hardy v. Shedden Co., (Notes) 37 L.R.A. 44; 5 Am.Jur. p. 723, sec. 385.

■ In Shannon v. Western Indemnity Co., Tex.Com.App., 257 S.W. 522, 524, the Commission of Appeals approved a definition of an independent contractor, which was in part: "A contractor is any person who, in the pursuit of an independent business, undertakes to do a specific piece of work for other persons, using his own means and methods, without submitting himself to their control in respect to all its details."

■ After a most careful study of the record we are convinced that the evidence shows without dispute that Elam did not undertake to do a specific piece of work for Willingham and Hilgenberg; that he merely sublet the bulldozer with Baldridge & Son's driver to Willingham and Hilgenberg to enable them to do their own work. See Hartell v. T. H. Simonson & Son Co., 218 N.Y. 345, 113 N.E. 255; American Express Co. v. O'Connor, 51 App.D.C. 359, 279 F. 997, 1000. We think the record as a whole discloses the fact, as stated by Willingham, that all Elam agreed to do was to sublease the bulldozer and driver to Willingham and Hilgenberg for $8.50 per hour, in the language of Elam, that for said consideration he merely "turned over the machine with the driver" to them. We think there is no evidence in the record that under the agreement between Elam and Willingham that Elam had the right to direct Bennett as to how the work was to be done on the Willingham-Hilgenberg farm. Plaintiffs cannot recover without evidence that at the time Bennett ran over and killed Hilgenberg he was the servant of Elam. 35 Am.Jur. 1012; 5 Tex.Jur. 171, sec. 513. We have concluded that the evidence wholly fails to show that he was. We think the following authorities compel that conclusion: Rumberger v. Welsh, 2 Cir., 131 P.2d 384; Irwin v. Klein, 271 N.Y. 477, 3 N.E.2d 601, 606; Waldman v. Picker Bros., Mun.Ct., 140 N.Y.S. 1019; Wylie-Stewart Machinery Co. v. Thomas, 192 Okl. 505, 137 P.2d 556;

Cartwright v. New Orleans Ry. & Light Co., 131 La. 210, 59 So. 124, 127; Ramsey v. New York Central R. Co., 269 N.Y. 219, 224, 199 N.E. 65, 102 A.L.R. 511. The judgment is affirmed.