ROY L. JONES TRUCK LINE et al. v.
JOHNSON et al.
No. 12133.

Court of Civil Appeals of Texas. Galveston.
Dec. 8, 1949.

Rehearing Denied Jan. 5, 1950.

C. A. Pounds, of Anahuac; Strasburger,
Price, Holland, Kelton & Miller, Philip L.
Kelton and Hobert Price, all of Dallas, for
appellants.

Guy C. Jackson, Jr., of Anahuac and Howard S. Hoover, of Houston, for intervenor-appellee Anchor Casualty Company.

Cain & Cain and Clarence D. Cain, of Liberty, Everett H. Cain, of Anahuac, Albert P. Jones and Helm & Jones, both of Houston, for appellees Mrs. Ida Dugat Johnson and David Lee Lawrence.

CODY, Justice.

Mrs. Ida Dugat Johnson, for herself and as guardian of her minor son, David Lee Johnson, brought suit against Roy L. Jones Truck Line, and Roy L. Jones, individually, d/b/a Roy L. Jones Truck Line, for damages negligently caused to Morris C. Johnson, husband and father of plaintiffs, on March 1, 1947, from which injuries the said Johnson died the following July. Mrs. Ida Dugat Johnson will hereafter be called plaintiff and Roy L. Jones Truck Line and Roy L. Jones, individually, d/b/a Roy L. Jones Truck Line will hereafter be called defendant. The insurance company carrying the compensation insurance for the deceased intervened to recover some $13,-000.00 which was paid out under the Workmen's Compensation policy.

The deceased was employed as a driller by the PLD Well Service at the time of the accident and at said time was engaged in assembling—re-erecting, a derrick for his employer near Barber's Hill in Chambers County on a lease known as Gulf Fee C-5. The rig had theretofore been used on a location across the road from the Gulf Fee C-5 and had been dismantled and had been hauled or moved in trucks belonging to defendant to the location on which it was being erected at the time of the accident. Plaintiff alleged with respect to the happening of the accident as follows:

"A rig was being erected on the location mentioned on the date stated. The substructure had been placed in position and a truck of the defendants was being used to raise parts of the rig into position. At the time of the occurrence made the basis of this suit, the starting leg of the rig was attached to the gin pole of the truck of the defendants and the truck and the employees of Roy L. Jones Truck Line were attempting to get the leg in position to fasten it to the substructure. Morris C. Johnson, deceased, as driller for PLD Well Service, was standing near a caterpillar tractor a short distance from the substructure. As the employees of the defendants were attempting to place the starting leg in position, the same got out of control as a result of the negligence of the defendants and its agents and representatives and was permitted to swing against the deceased, pinning him to the caterpillar tractor, thereby inflicting serious abdominal injuries on the said Morris C. Johnson. As a result of this occurrence, the husband and father of your plaintiffs sustained bodily injuries which produced his death thereby", etc.

It will be noted that plaintiff alleged that the starting leg of the rig was attached to the gin pole of the ten ton truck belonging to defendant. This fact is not disputed, nor is it disputed that the driver of said truck and helper or swamper were in the general employment of defendant. Nor is it disputed, on this appeal, that the negligence of said truck crew or its swamper caused the starting leg of the rig to strike the deceased and inflict injuries which resulted in his death. The position of defendant is that he had rented the truck and its crew to the PLD Well Service and that said crew, at the time of the accident, was under the control of the PLD Well Service. The position of defendant with respect to his major defense is set forth in his answer in these words:

"3. Specially answering, Roy L. Jones says that he is in the business of renting trucks and drivers to the public and in such capacity he rented some equipment and men to PLD Well Service Company to do some work in Chambers County, and to be used at such times and places as desired by PLD Well Service Company; and that PLD Well Service Company desired to erect a jackknife rig in Chambers County, and to erect the rig the PLD Well Service Company used not only the equipment and men rented from him but also other men and other equipment procured from some other party or parties.

"4. Further specially answering, Roy L. Jones says that at the time of the accident in question Morris C. Johnson was a driller for PLD Well Servicing Company, and he or some other representative was in charge of the work and had full authority to direct the work and all of its details and did direct all of the details of the work.

"5. Further specially answering, Roy L. Jones says that at the time of the accident the men on the job were erecting a jackknife derrick and in so doing they used one of Roy L. Jones' trucks, which had a winch attached to it, and they were moving a starting leg which was attached to the winch, and in order to move the starting leg to its proper place it was necessary to back the truck, and the driver of the truck being guided as the truck moved along slowly while the leg was dangling in the air."

At the conclusion of plaintiffs' evidence and again at the conclusion of all the evidence, the defendant moved for a directed verdict, which motions were refused, and the case was submitted to the jury on 24 special issues. The first eight of said special issues inquire with reference to the negligence of defendants' truck crew or that of the swamper of said crew, and all of said special issues, except one, were answered so as to convict the truck crew, including the swamper, of negligence which was a proximate cause.

Special issue No. 8-A as answered by the jury was as follows:

"Do you find from a preponderance of the evidence that Roy L. Jones Truck Line was an independent contractor in the use of its truck in moving the derrick, substructure and other drilling equipment on Gulf Fee C-5 lease on March 1, 1947?

"Answer 'Yes' or 'No'.

"Answered: Yes.

"By the term 'independent contractor', as used in the foregoing issue, is meant a person who, in the pursuit of an independent business, undertakes to do a specific piece of work for others, using his own means and methods, without submitting himself to their control in respect to all it details and thereby represents the will of those for whom the work is being done only as to the result of his work, and not as to the means by which it is accomplished."

Special issue No. 9 as answered by the jury was as follows:

"Do you find from a preponderance of the evidence that Morris, the truck swamper, and Collins, the truck driver, were subject to the control of the PLD Company as to the details of the way and manner in which the starting leg was being moved on the occasion in question?

"Answer 'Yes' or 'No'.

"Answered: No."

Based upon the answers of the jury to the special issues, the court rendered judgment for plaintiffs, wife and mother, for a total of approximately $54,000.00, the first $13,000.00 to be paid over to the Workmen's Compensation Insurance carrier who was subrogated thereto. Some $7000.00 of the judgment being for medical attention to the deceased; some $1800.00 being for damages of lost earnings prior to the deceased's death. Some $12,000.00 being awarded on account of the son who was 15 years of age at the time of the accident, and some $32,000.00 being awarded to the wife on account of the death of the deceased.

The defendant predicates his appeal upon 12 points, the first four of the points complain in substance that the court should have held that the evidence established, as a matter of law, that the defendant was not liable for the acts of the employees of the truck crew at the time of the accident—that is, established that the defendant was not an independent contractor in the use of his truck on the occasion in question.

The fifth point complains that the answer of the jury to special issue No. 8-A holding defendant to be an independent contractor was contrary to the overwhelming preponderance of the evidence.

Defendant's points 6, 7, 8 and 9 complain of jury misconduct such as (a) discussing in the jury room that defendant was carrying liability insurance, and (b) discussing

the question of how much plaintiffs would have to pay as attorneys fees, and (c) because one of the jurors stated that due to his experience in the oil fields, he knew that defendant was an independent contractor, and (d) because one of the jurors gave evidence in the jury room of his own experience in the oil field as to how starting legs should be raised. Point 10 complains of concealment by a juror on his voir dire examination of material evidence; another point complains of the gross excessiveness of the verdict; another point complains of submitting to the jury special issue No. 1.

Defendant's said points 1–5, inclusive which complain that the evidence was insufficient to support the jury's finding that defendant was an independent contractor in the use of his truck on the occasion in question, are overruled.

The evidence shows that PLD Well Service Company, hereafter referred to as the PLD was engaged in the business of drilling wells; that the PLD did not have any trucking equipment, but contracted for its hauling. The evidence further was to the effect that before it would deal with a truck line engaged in oil field hauling it required proof that such truck line had its trucks covered with adequate public liability insurance. (This last mentioned evidence was introduced out of the hearing of the jury and is not considered in testing the sufficiency of the evidence to support the jury finding that defendant was an independent contractor).

The evidence further showed that sometime prior to the accident, defendant's line became one of those which PLD would employ to do its hauling. This was brought about when defendant, in company with Mr. "Fat" Stranger, came to the PLD to solicit a share of PLD's hauling. Thereafter, when the PLD required the services of defendant's truck line, it would call defendant's office by telephone and place its order with Mr. Stranger or whoever in the office took the call. The PLD would by its call notify defendant's office that the PLD was going to work on a certain job, and would request defendant's office to have trucks at the designated place at the designated time to move PLD's equipment. If one of the hauling lines which was approved by PLD did not have equipment available, another company would be called. In other words, defendant did not do all of PLD's oil field hauling. Defendant's trucks were manned by drivers and swampers who were experienced oil field hauling men.

The PLD paid defendant $12.50 per hour for the truck and its crew.

For two days prior to the accident defendant's truck and crew had been engaged in moving PLD's equipment from a location, which was across the road, to the location where the accident occurred. The derrick had been knocked down in order to be moved, and to be re-erected on the new location. Trouble was encountered in the process of putting the substructure together. One of the sides had become sprung. The PLD was using a caterpillar tractor to line up the holes in order that the pins could be placed therein. One of PLD's employees was on top of the substructure giving signals for the purpose of directing the operation of the "cat". However, the operator of the "cat" was so situated that he could not see the signals as given by the man on the substructure, and such signals had to be relayed to him. The deceased was engaged in such relaying of signals when he was injured by the starting leg which was appended from the gin pole of defendant's ten ton truck. The deceased was the day driller on PLD's drilling crew, and in the absence of the tool pusher (i. e., superintendent) of the drilling crew, normally acted as tool pusher. It is the work of the drilling crew to erect the derrick. The man in charge of the drilling crew decides when the substructure is ready, and when he wants the starting leg put on it. By signal or otherwise, he notifies the truck crew when the drilling crew is ready for the starting leg, which has a pin on it for the purpose of being attached to the substructure.

As heretofore indicated, the starting leg was suspended from the gin pole on de-

fendant's truck, which was a ten ton one, described by the swamper of the truck crew as a "wheel horse". The cable which was attached to the starting leg was attached to the power winch on the truck. Mr. "Fat" Stranger was giving the signals to the truck crew. It is inferable from the evidence that, when the deceased thought it was time to put the starting leg in place, he would have given the truck crew the information that it was time to deliver the starting leg so as to be attached to the substructure. While the truck driver and swamper were maneuvering the starting leg to have it ready, one end of the starting leg (which was suspended from the cable which was attached to the middle thereof) struck a mound of earth, and it rebounded so as to strike the deceased who was near the "cat", and engaged, as stated above, in relaying signals to the "cat" operator. It need hardly be added that, at the time of the accident, the deceased had not informed the truck crew that he was ready for the starting leg to be delivered in place.

The evidence established without dispute that the truck crew were the general employees of defendant; that the PLD, nor any of its employees, had any power to discharge said employees. From the evidence it is inferable that the drilling crew and the truck crew must co-ordinate their work and to co-operate to the end that the starting leg be delivered at the right time and place. And it is further inferable that such co-ordination is dependent upon information being passed from the tool pusher to the truck crew. It is further inferable that, if the truck crew would not co-operate upon being given the necessary information, the tool pusher could tell the truck crew to leave the job; but that he could not discharge any member of the crew. Only defendant, or some one in his organization could do that.

■ An outstanding authority on the issues which arise under facts which determine whether the general employees of an independent contractor remain his employees so as to make him responsible for their negligence, or become "loaned servants" so as to impose liability upon the one who has

employed the independent contractor, is Shannon et al. v. Western Indemnity Co., et al., Tex.Com.App., 257 S.W. 522, 523. In that case the court quoted with approval the following: "No better test can be applied than to say that the relation of master and servant exists where the master retains or exercises the power of control in directing, not merely the end sought to be accomplished by the employment of another, but as well as the means and details of its accomplishment; 'not only what shall be done, but how it shall be done.'" In the cited case some six tests were laid down to determine whether the relationship was that of master and servant, or that of contractor and contractee.

■ Here the evidence showed that oil field hauling was a specialized business, and that it required special equipment, and men experienced in the work. It was inferable that the truck driver and the swamper knew how to deliver the starting leg with the special equipment which they operated, when they received information that the substructure was ready, and that the drilling crew would not know how to do same. Further, that defendant furnished all of the necessary hauling equipment, which was properly equipped, and furnished the skilled labor necessary to that end. Without further tracking the tests given in the Shannon case, we think that it was, to say the least, reasonably inferable from the evidence in this case that defendant was an independent contractor with reference to the truck on the occasion in question.

In the case of Smith Bros., Inc., v. O'Bryan, 127 Tex. 439, 94 S.W.2d 145, 149, the court said: "In practically every case of employment of truck drivers the employer has a right to designate the materials to be hauled, to direct to whom and where they are to be delivered, and to require a receipt showing [prompt] delivery. He also has the right to require expeditious service to the end that the general results of the employment may be attained. Yet it has never been held that these elements of control were sufficient to negative the independence of the contract, when, as here, practically all of the

predominant circumstances indicate that the relationship is one of employer and contractor." In the cited case the court further stated " * * * 'But in weighing the control exercised we must carefully distinguish between authoritative control and mere suggestion as to detail or the necessary cooperation where the work furnished is part of a larger undertaking. Standard Oil Co. v. Anderson, 212 U.S. 215, 221, 222, 29 S.Ct. 252, 53 L.Ed. 480.' "

The said case of Standard Oil Co. v. Anderson, just mentioned, was one where the work of the contractee and contractor, had to be co-ordinated. In that case the winchman was hired and paid by the oil company who alone had the power to fire him. The stevedore paid the oil company $1.50 a thousand for the hoisting. The hours of the winchman necessarily conformed to the hours of the longshoreman. The winch and winchman were located where it was impossible to determine the proper time for hoisting and lowering the cases of oil, and the winchman necessarily depended upon signals from others. These signals were given by an employee of the stevedore. The negligence consisted of lowering a draft of cases before receiving the signal. The court held that the winchman was the general employee of the oil company, and that in order to relieve defendant from its liability as such general employer, it must appear that the relation for the time being was suspended, and that a new relation had come into existence between the winchman and the stevedore. Said the court: "Much stress is laid upon the fact that the winchman obeyed the signals of the gangman, who represented the master stevedore, in timing the raising and lowering of the cases of oil. But when one large general work is undertaken by different persons, doing distinct parts of the same undertaking, there must be co-operation and co-ordination, or there will be chaos. The giving of the signals under the circumstances of this case was not the giving of orders, but of information; and the obedience to those signals showed co-operation rather than subordination, and is not enough to show that there has been a change of masters." [212 U.S. 215, 29 S.Ct. 256]

In the normal course of the erection of the derrick, a member of the drilling crew, (and presumably it would have been the deceased), would have signaled the information to the truck crew that it was time for the truck to deliver the starting leg in place. This in itself, as we have just seen, would not have changed the status of the members of the truck crew from that of general employees of defendant to that of special servants of PLD. But the accident occurred before any member of the crew gave any such signal. The evidence warrants, if it does not compel, the conclusion that defendant was with respect to the truck acting as general contractor. The negligence of its crew was the negligence of the defendant.

The defendant relies strongly upon the holding made in Hilgenberg v. Elam, Tex. Civ.App., 192 S.W.2d 799, 198 S.W.2d 94, as authority requiring that the truck crew be held to be the special servants of PLD. The case is simply not in point on the facts. The opinion in that case has been explained in part by Insurors Indemnity & Ins. Co. v. Pridgen et al., Tex.Sup., 223 S.W.2d 217.

This brings us to defendant's points 6–9, inclusive.

By his 6th, 7th, 8th and 9th points, defendant complains of the court's refusal to grant a new trial because of jury misconduct occurring in the jury room during their deliberations on the special issues, in the following particulars (1) that the jury discussed as a fact that defendant was carrying liability insurance; (2) that the jury discussed how much attorney's fees plaintiffs would have to pay; (3) that one of the jurors stated to the other jurors that due to his experience in the oil fields he knew that the defendant truck line was an independent contractor in this case; (4) that the jury during its deliberations received independent evidence from one of its members that due to his experience in the oil fields he knew how starting legs should be raised.

Upon the hearing on the motion for new trial, seven of the jurors were examined with respect to the alleged misconduct, and based on such evidence the court refused to grant a new trial because of such misconduct, and, in response to defendant's request, made findings of fact and conclusions of law with respect to misconduct, which fact conclusions, so far as here material, are:

(A) That on one occasion during the jury deliberations, liability insurance coverage of defendant was mentioned but was not discussed. "When the mention was made, it was promptly rebuked by the foreman who stated that such matter was outside of the evidence and could not be considered. The matter was promptly dropped and no further mention of liability insurance was made. The mention of liability insurance was made after the jurors had unanimously agreed upon the answers to all of the issues in the charge of the court except special issues Nos. 3, 4, 7 and 8.

(B) That attorneys' fees for plaintiffs' counsel was mentioned once during the jury deliberations, but not discussed; that "the foreman promptly rebuked the juror who made the mention of the matter and stated that that was not based on the evidence and should not be considered. The matter was dropped promptly and no further mention of attorneys' fees was made." That such mention was made after the jurors had unanimously agreed upon the answers to all issues except Nos. 3, 4, 7 and 8.

(C) That there was no discussion or mention of any matter outside the record while the jury was deliberating upon its answers to the issue of "independent contractor". That during consideration of special issues 8-A and 9, no mention was made by any juror of any experience he had in the oil fields. That the juror Tennis "did not at any time during the deliberations of the jury make any statement about his oil field experiences. Any comment of the juror Beatty concerning his oil field experience was made after the jurors had unanimously agreed upon

the answers to all issues" except special issues Nos. 3, 4, 7 and 8.

(D) That the juror Beatty, after the jurors had agreed upon all the answers to the special issues submitted, except special issues Nos. 3, 4, 7 and 8, made a statement to the effect that he had seen starting legs raised in the oil fields and believed that the starting leg involved could have been raised high enough to clear the mound of dirt. That such comment could only have influenced the answers to special issues Nos. 7 and 8. That the jurors had theretofore answered all special issues except Nos. 3, 4, 7, and 8. That the answers to special issues other than 3, 4, 7 and 8, required the rendition of the judgment which has been rendered in the case.

Special issues Nos. 3, 4, 7 and 8, referred to in each of the foregoing findings of the court, and as answered, were as follows:

Special Issue No. 3: "Do you find from a preponderance of the evidence that the failure of the truck crew to attach a guard chain or cable to starting leg and back to the truck was negligence, as that term is defined to you herein?

"Answer: Yes or No."

(The issue was answered "No".)

"If you have answered the preceding special issue No. 3 'Yes' and only in that event, then answer:"

Special Issue No. 4: (This was the proximate cause issue, and was not answered).

Special Issue No. 7 inquired whether the failure of the truck crew to raise the starting leg to sufficient height to clear the mound of dirt was negligence, and special issue No. 8, inquired if such failure was a proximate cause. The jury answered both special issues in the affirmative.

Barrington v. Duncan, 140 Tex. 510, 169 S.W.2d 462, was a case where jury misconduct consisted of a statement made by a juror that a truck had to carry liability insurance in the amount of $10,-000.00. The trial court found that the alleged misconduct had occurred, but that

as soon as the insurance was mentioned that the foreman promptly rebuked any such matter as not being in the evidence, and not proper to be considered, and the trial court found that such misconduct had no effect. The Supreme Court noted in its opinion that the question of the extent of the plaintiffs' injury was sharply contested, and that the fact that the damage was fixed at the amount mentioned as the amount of the insurance was significant, and reversed the trial court. In the course of its opinion, the court noted that Texas Rules of Civil Procedure, Rule 327 had replaced the rule which formerly applied, and that now the person asserting misconduct has the burden of proving in the usual way that the misconduct occurred, and also of showing that such misconduct probably resulted in injury to him; that when the fact of misconduct is established as a fact, the question of injury is one of law for the reviewing court. That in the determination of the question of injury the entire record in the case is to be looked to; that it is never permissible to allow a juror to preserve or destroy his verdict by testifying to his mental processes by which he reached it. That holding does not mean that the bare fact of jury misconduct destroys the verdict. The holding shows that the burden is on him who asserts such misconduct to show that such misconduct probably resulted in injury to him. The extraordinary coincidence that, where the evidence showed sharp conflict as to the extent of the injury, the extent of the injury was found to be in the exact amount of the liability insurance was sufficient to show the misconduct probably resulted in injury.

However, in the case at bar, it was shown that the jury had passed over special issues 3, 4, 7 and 8, because they could not at once agree unanimously upon them, but answered all of the remaining issues, including the issues on damages, as they were reached, and that said answers were never thereafter changed. That is to say, the evidence established that the jury misconduct complained of, whether in the mention of liability insurance, attorneys' fees,

etc., occurred after all issues except 3, 4, 7 and 8 had been finally answered in the sense that they were not thereafter changed. It is difficult to see how it can be contended that defendant was injured by the bare mention of insurance or attorneys' fees without any amounts being stated after the damage issues had been firmly answered. It was undisputed that the husband and father of plaintiffs had been injured to the extent that his death injured them. It has frequently been held that mere mention that plaintiff would have to pay attorneys' fees followed by immediate admonition that such matters cannot be considered, that same is not such misconduct as requires reversal. See Bradley v. T. & R. Ry. Co., Com.App., 1 S.W.2d 861 (this was under old rule); and so of St. L. S. W. Ry. Co. of Tex. v. Gilpin, Tex.Civ.App., 73 S.W.2d 1054, 1057, writ refused. In the last cited case the court said "the record discloses that some juror, during their deliberation and possibly before the jury had agreed upon the amount of appellee's damages, made the remark, 'Wonder what is the usual charge,' meaning attorney's fee, when some other juror spoke up and said that they could not consider that. There is no evidence that any juror did take into consideration the amount that appellee would have to pay his attorneys in arriving at the amount of his damages. In this state of the record we think it cannot be said that the trial court abused its discretion in denying a new trial on this ground."

There is nothing to indicate here that the mention of insurance or of attorneys' fees, without any specification as to amount, which was promptly rebuked and stopped as improper, was taken into consideration by the jury. Improper conduct which occurred after the jury has reached its verdict upon matters that could be affected thereby is not reasonably calculated to affect the result. See Triangle Cab Company v. Taylor, 144 Tex. 568, 192 S.W.2d 143; Ry. Express Agency v. Gray, Tex.Civ.App., 211 S.W.2d 1013; Helton v. Lose & Fosdick Drilling Co., Tex.Civ.App., 147 S.W.2d 831.

No statement made in the jury room before special issues Nos. 3 and 4 were answered could have been harmful to defendant because they were answered in his favor. No statement made in the jury room before special issues Nos. 7 and 8 were answered could do more than vitiate the same as a support to the judgment. But the judgment is amply supported by other findings of negligence, and that same were a proximate cause. See Galveston, H. & S. A. Ry. Co. v. Wells, 121 Tex. 310, 50 S.W.2d 247. We overrule defendants' points 6–9 inclusive.

Defendant's 10th point complains of the court's refusal to grant a new trial because the juror Hall concealed on voir dire examination that his father had recovered a judgment for $47,000.00 in a damage suit, which judgment was subsequently reversed, and defendant asserts in his said 10th point that it is obvious that such an experience in his family would be calculated to cause such a juror to be prejudiced against the defendant.

The evidence shows that defendant's attorney asked the jury panel this general question, "* * * if there was anything in your experience that would cause you to lean one way or the other in this type of case and prevent you from being fair equally to the defendant and to the plaintiff alike; * * *". The members of the panel were likewise asked to consider such general question as addressed to each of them individually. The evidence showed that Mr. Hall did not answer said general question, and did not tell about the judgment and its reversal. Upon the hearing on the motion for new trial, Mr. Hall testified that he had had no past experience that made him lean to either side of the law-suit. The court found as a fact that the juror Hall was not asked any specific question about claims or suits which he or members of his family might have

had. The court further found that Hall answered truthfully the questions that were propounded to him on voir dire examination, and that he was not biased or prejudiced in any way.

We overrule defendants' said point 10. By the form of the question which defendant propounded the panel, he made the members of the panel judge of whether they had a past experience which made them incapable of dealing justly with the parties to the suit. To have a father who recovered a large judgment in a damage suit, which was reversed, is not a legal disqualification to serve on a jury. Even general questions with respect to legal disqualifications are usually insufficient to satisfy the diligence required in probing the mind of a juror. "Specific inquiry must be made as to the disqualification subsequently discovered." 26 Tex.Jur. 777.

Defendants' point 11 complains that the amounts of damages awarded deceased's wife and son were grossly excessive. We have carefully examined the evidence and are not prepared to say that the awards are so great as to require a remittitur. No purpose would be served to further extend this opinion to discuss the point, which is overruled.

Defendants' point 12 complains of special issue No. 1 as being duplicitous and multifarious. We believe that issue as submitted was an ultimate issue, but in any event, even should the special issue be vulnerable to defendants' objection, the point does not present reversible error, for other findings of the jury which are not assailed are sufficient to support the judgment. See Galveston, H. & S. A. Ry. Co. v. Wells, supra.

The judgment should be affirmed, and it is so ordered.

Judgment affirmed.